# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

CURTIS GIOVANNI FLOWERS;

*Plaintiff*,

v.

DOUG EVANS, in his individual capacity,
JOHN JOHNSON, in his individual capacity,
WAYNE MILLER, in his individual capacity,
and JACK MATTHEWS, in his individual
capacity;

*Defendants*.

Civil Action No. 4:21cv110-MPM-JMV _____

COMPLAINT

JURY DEMANDED

## COMPLAINT

Curtis Giovanni Flowers ("Plaintiff" or "Mr. Flowers"), alleges the following against Defendants Doug Evans ("Evans"), John Johnson ("Johnson"), Wayne Miller ("Miller"), and Jack Matthews ("Matthews") (collectively, "Defendants") and states as follows:

## INTRODUCTION

1.     Curtis Flowers is a Black man who spent over two decades—nearly half his life—on death row in Mississippi for crimes he did not commit.  He was tried six times for the 1996 murders of four people in a furniture store in Winona, Mississippi.  District Attorney Doug Evans prosecuted all six trials.  None of the trials resulted in a legally valid conviction.  Four of them resulted in capital murder convictions and death sentences, all of which were overturned because of Evans's misconduct, including what the United States Supreme Court described as a "relentless, determined effort to rid the jury of black individuals" throughout the course of the trials.  The other

two resulted in mistrials due to hung juries. In the meantime, Mr. Flowers spent twenty-three years in prison, most of it on Death Row.

2.     After the case was returned to the trial court for a potential seventh trial, Mr. Flowers was released on bail on December 16, 2019. Evans then withdrew from the case in the face of a motion to recuse him. The Mississippi Attorney General was appointed in his place. After what she called an "independent review of the evidence," she moved to dismiss the charges with prejudice "in the interests of justice." The trial court judge granted that motion on September 4, 2020.

3.     This lawsuit is brought against Evans, Johnson, Matthews, and Miller for their wrongful actions relating to the investigation that caused Curtis Flowers to spend 23 years in prison for a crime that he did not commit.

4.     Mr. Flowers should have never been charged in the first place. The July 16, 1996 Tardy Furniture murders occurred during a spree of armed robberies and murders in commercial establishments and banks that plagued Montgomery County and nearby counties from 1995 to 1997. Eight days before the Tardy Furniture murders, some person or persons broke into Tardy Furniture at night through the roof, attempted to crack the safe, and fled through the side door, taking the side door key in the process.

5.     The crime scene at Tardy Furniture on the day of the murders reflects the actions of a precision shooter with criminal experience. The killers left with money from the same safe someone had tried and failed to rob eight days earlier. The audacity and precision of the weekday morning murders at Tardy Furniture, and the earlier rooftop break-in, suggest that they were committed by a person or persons with a history of violence and methodical robberies.

6.     Despite Doug Evans's constant claim over the years that there were no suspects other than Curtis Flowers, there were multiple alternative suspects, including people with histories of violence, murder, and commercial burglaries.  One suspect owned the same type of gun that the prosecution claimed was the murder weapon.  His cousin is a violent career criminal who was arrested for another commercial armed robbery in the spree that afflicted the Montgomery County area in the mid-1990s and another cousin had attempted a rooftop robbery.  Two of the alternative suspects wore Fila Grant Hill shoes, which allegedly were worn by the perpetrator of the Tardy Furniture murders.  Most of them lived in Montgomery County and the others apparently were in Mississippi around the time of the murders.

7.     By contrast, Curtis Flowers was a gospel singer with no criminal record when he was arrested at the age of 26.  Nothing in his background suggests that he would or could commit a brazen daylight robbery of a commercial establishment and kill four people with precision shooting.  His record for the 23 years he spent in prisons and jail after his arrest confirms this.  His record was that of an unusually peaceful person who cooperated with guards and avoided conflict.  He had only one minor disciplinary infraction the entire time, and his bail motion included affidavits from correctional administrators and guards attesting to his peaceful and cooperative nature.  The former Deputy Commissioner of Institutions at the Mississippi Department of Corrections said it was "one of the best jail and prison records I have ever reviewed."

8.     Despite evidence pointing to multiple alternative suspects, Defendants failed to conduct an in-depth investigation of any of them and concealed the paltry investigation that was conducted.  One suspect was held for several days and questioned but law enforcement failed to create a report of the interviews; they also failed to create reports of the witnesses who apparently saw that suspect in the downtown area on the morning of the murders.  There is also no notation

3

about another suspect whose photo was placed in a photo line-up. Indeed, there are no investigative summaries about the case or the steps that were taken to find the killer at all. The witness interviews that did occur are documented only by random handwritten notes. There appears to have been no inquiry into a possible connection with the break-in eight days earlier. Instead, the investigation was engineered to implicate Curtis Flowers.

9. Multiple witnesses have reported pressure by Defendants to tailor their testimony to fit the narrative of Defendants against Curtis Flowers. As one said, "they had it down pat for me" when they sent a police car and brought him in for questioning. When a Montgomery County man found a gun not far from Tardy Furniture, of the type used in the murders, he gave it to police and apparently it was turned over to the District Attorney's office, but it was never taken to the crime lab for testing and no one knows its whereabouts.

10. The theory that Curtis Flowers committed these murders never made sense. And the case built as a result of the misconduct by Defendants eventually fell apart. Indeed, in support of its request that the Circuit Court of Montgomery County dismiss the indictment against Mr. Flowers with prejudice in the "interest of justice," the Mississippi Attorney General stated that its independent review of the evidence" demonstrated that "there is no key prosecution witness that incriminates Mr. Flowers" who has not had multiple, conflicting statements in the record.

**THE PARTIES**

11. Plaintiff Curtis Giovanni Flowers is a Black man from Winona, Mississippi who was wrongfully incarcerated in Mississippi for over two decades. Mr. Flowers was tried an unprecedented six times for the Tardy Furniture murders and spent nearly 23 years on death row in Mississippi for crimes he did not commit.

4

12.     Defendant Doug Evans is the District Attorney for Mississippi's Fifth Circuit Court District, which covers Attala, Carroll, Choctaw, Grenada, Montgomery, Webster, and Winston Counties.  Evans was deeply involved in the investigation of the case and led the prosecution in all six of Mr. Flowers's trials.  Evans is being sued in his individual capacity.

13.     Defendant John Johnson was lead investigator in the investigation of the Tardy Furniture murders.  Johnson is being sued in his individual capacity.

14.     Defendant Wayne Miller is a former Lieutenant of the Mississippi Highway Patrol who investigated the Tardy Furniture murders.  Miller is being sued in his individual capacity.

15.     Defendant Jack Matthews is a former Lieutenant of the Mississippi Highway Patrol who investigated the Tardy Furniture murders.  Matthews is being sued in his individual capacity.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the Fourth, Sixth, and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

17.     Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate State law claims pursuant to 28 U.S.C. § 1367.

18.     Venue in this district is proper pursuant to 28 U.S.C. § 1391.  All Defendants live in this state and at least one of the Defendants lives in this District, and the events giving rise to Mr. Flowers's claims occurred in this District.

## FACTUAL BACKGROUND

19.     On the morning of July 16, 1996, three individuals—Bertha Tardy, Robert Golden, and Carmen Rigby—were found dead at the Tardy Furniture store in Winona, Mississippi.  A fourth victim, Derrick Stewart, died from his gunshot wounds at the hospital about a week later.

5

The Mississippi Highway Patrol, Montgomery County Sheriff's Office, and the District Attorney's Office for Mississippi's Fifth Circuit Court District were all involved in the investigation of the Tardy Furniture murders.

20. Evans and his office coordinated the investigation into the Tardy Furniture murders. According to Matthews, all information about the investigation was "funneled . . . through the D.A.'s office." *Flowers VI* Tr. 2577, *State v. Flowers*, No. 2003-0071-CR (Miss. Cir. 2010) ("*Flowers VI* Tr."). During a January 29, 2016 hearing, Evans emphatically represented to the circuit court: "As far as [the] Flowers case, there was nothing that went on that I didn't personally . . . there was nothing that went on in that case that I was not aware of." Hr'g Tr. 33, *State v. Flowers*, No. 2015-DR-005910-SCT (Miss. Cir. Jan. 29, 2016) ("Jan. 2016 Hr'g Tr.").

21. Evans also maintained centralized control of the entire investigation into the Tardy Furniture murders. As Evans himself explained:

> The way this case worked, every agency that was working on it, did different parts. They complied one file at our office with everything that everybody worked on. Everything that was involved with any agency, police department, sheriff's department, MDI, crime lab, all of it was in our file. So everything that they have would be in our file.

*Id.* at 58-59.

22. During the investigation, law enforcement determined that the gunshot wounds that killed the victims were consistent with a .380 caliber pistol. Doyle Simpson, a resident of Winona, claimed that his .380 caliber pistol was stolen the same day.

23. Mr. Flowers was questioned on the afternoon of the murders by John Johnson and another investigator because of his previous employment at Tardy Furniture. Mr. Flowers also consented to a gunshot residue test. Mr. Flowers was not arrested on the day of the murders.

24. In fact, no one was arrested on July 16, 1996, or in the weeks that followed. As the weeks and months passed, the local newspaper ran repeated front page news stories highlighting

that no one had been arrested. Public pressure to make an arrest mounted on local officials. Ultimately, a $30,000 reward was offered for information about the murders.

25.     The crime scene demonstrated the killer was someone with firearms proficiency, who was likely using a gun with which the killer was familiar. Four people, none of whom were restrained, were killed with precision shooting from five consecutive shots from various, suggesting the killer had significant firearms training and skill. Moreover, several live rounds found on the floor suggest that the gun jammed repeatedly and had to be cleared.

26.     The events leading up to the Tardy Furniture murders likewise pointed to a perpetrator with a history as a career criminal. On the morning of July 8, 1996—eight days before the murders—Ms. Tardy discovered that some person or persons broke into Tardy Furniture the night before by breaking a sky light and coming through the roof, unsuccessfully attempted into break in the safe, and fled through the side door, taking the side door key with them.

27.     This break-in was one in an extensive crime wave in the area spanning from 1995-1997, much of it located in Montgomery County but also in adjacent counties. The crimes included several armed robberies of commercial establishments, as well as several murders.

28.     Defendants never explored a connection between the break-in eight days earlier—obviously an effort to steal money—and the murders and robbery of the cash drawer from the safe. Matthews testified that he had "got a copy of the report that [the police department] had made" on the break-in but when asked if there was a "real effort to connect the two incidents," he responded "I don't know what was done, but I don't know that there was an effort." *Flowers VI* Tr. at 2564–65.

29.     No plausible motive tied Mr. Flowers to the crimes. The prosecution's theory was that Mr. Flowers, a gospel singer with no criminal record, decided to commit a quadruple murder

with precision shooting because he was upset over having been let go from a minimum wage job at Tardy Furniture where he had only worked for a total of three and a half days.

30.     However, the evidence did not support this theory: Instead, while working at Tardy Furniture on July 3, 1996, Mr. Flowers dropped and damaged several batteries after failing to secure them to a truck.  He informed Bertha Tardy about the damage and she decided to deduct the replacement costs from Mr. Flowers's paycheck.  Despite the battery incident, Ms. Tardy loaned Mr. Flowers thirty dollars before he left work that day.  Among the evidence documented at the scene of the murders was an uncashed check for $82.58, which was sitting next to the robbed cash drawer, made out to Mr. Flowers for his owed pay.

31.     Following the July 4 holiday, Mr. Flowers failed to report for work for three days—something he had done in previous jobs.  When he called Ms. Tardy to ask if he should come in, she informed him that he no longer had a job, and that the time he had worked prior to the holiday covered the cost of the damaged batteries.

32.     Despite the evidence that the killer was a career criminal with extensive firearms proficiency and an inclination toward methodical robberies, Evans and investigators engineered the arrest of Mr. Flowers in January 1997—six months after the Tardy Furniture murders—despite the fact he had no criminal record, no history of firearms proficiency, and nothing in his background to demonstrate the inclination or ability to commit a crime like this.

**Six Trials and Four Appeals**

33.     In all, Mr. Flowers was tried six times for the same capital offenses, all by the same prosecutor, Doug Evans.  Throughout each of the six trials and post-conviction proceedings, Evans engaged in a repeated pattern of misconduct.  .

34.     In 1997, a Montgomery County Grand Jury returned four indictments against Mr. Flowers, each charging him with a separate count of capital murder for the murders of Bertha Tardy (Montgomery County Case No. 7447), Robert Golden (Case No. 7448), Carmen Rigby (Case No. 7449), and Derrick Stewart (Case No. 7450).

35.     The State selected the Bertha Tardy indictment, Case No. 7447 ("*Flowers I*"), for the first trial.  Mr. Flowers pled not guilty.  During jury selection, Evans peremptorily struck all five Black venire members tendered for service.  Mr. Flowers was tried by an all-white jury, found guilty, and sentenced to death on October 17, 1997.  Mr. Flowers appealed his conviction and sentence in *Flowers I*.

36.     While that appeal was pending, the State proceeded to trial again, this time on the Derrick Stewart indictment, Case No. 7450 ("*Flowers II*").  During jury selection, Evans peremptorily struck all five Black venire members tendered for service; the trial court disallowed one strike on *Batson* grounds.  On March 31, 1999, Mr. Flowers was convicted and sentenced to death.  Mr. Flowers appealed his conviction and sentence in *Flowers II*.

37.     On December 21, 2000, the Mississippi Supreme Court reversed Mr. Flowers's conviction and sentence in *Flowers I* on the basis of prosecutorial misconduct relating to, inter alia, introduction of evidence concerning other separately indicted crimes, arguing facts not in evidence, improper cross-examination of Mr. Flowers, and improper comment by the trial court. *Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

38.     On April 3, 2003, the Mississippi Supreme Court reversed Mr. Flowers's conviction and sentence in *Flowers II on* the basis of the same kinds of prosecutorial misconduct that occurred in *Flowers I*.  *Flowers v. State*, 842 So. 2d 531 (Miss. 2003) (*Flowers II*).  The court found that Evans repeatedly violated settled Mississippi law by introducing evidence concerning

other crimes. *See id.* at 543–44 ("[T]he State should find little solace in the fact that we acknowledge here that it tried Flowers on the Stewart indictment prior to our decision in *Flowers I,* because in *Flowers I* we made no new pronouncements of law nor did we overrule any prior case or cases in reaching the conclusion we did. Instead, as noted above in reversing the conviction in *Flowers I* we applied the all-too-familiar Miss. R. Evid. 404(b)/403 balancing test based on our well-established case law interpreting these rules of evidence.").

39. Both *Flowers I* and *Flowers II* were remanded to the Montgomery County Circuit Court for further proceedings. On remand, the State abandoned its effort to charge and try the four murders separately. The prosecution against Mr. Flowers was renumbered as Montgomery County Circuit Court Case No. 2003-0071-CR, and all subsequent trials dealt with all four charged capital murders.

40. During jury selection for the third trial (*Flowers III*), Evans exercised all fifteen available peremptory strikes against Black venire members. Mr. Flowers was again tried by a jury and, on February 11, 2004, was convicted of four counts of capital murder and sentenced to death.

41. Once again, Mr. Flowers appealed his convictions and sentences. On February 1, 2007, the Mississippi Supreme Court reversed Mr. Flowers's convictions and sentences on the basis of egregious prosecutorial misconduct, including overt racial discrimination by the prosecution in its exercise of peremptory challenges, which the court called "as strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge." *Flowers v. State*, 947 So. 2d 910, 935 (Miss. 2007).

42. Mr. Flowers was tried a fourth time in November 2007 (*Flowers IV*). During jury selection, Evans exercised all eleven available peremptory strikes against Black venire members.

At this fourth trial, the State elected not to seek the death penalty. That trial ended in a mistrial when the jury was unable to reach a verdict.

43. The State of Mississippi then tried Mr. Flowers a fifth time in September 2008 (*Flowers V*). This time, the State returned to seeking the death penalty. The record of the fifth trial did not record the race of the venire members who were struck. Again, the jury was unable to reach a verdict on guilt or innocence, and Mr. Flowers's fifth trial ended in a mistrial.

44. Undeterred, the State pressed forward, trying Mr. Flowers for a sixth time in June 2010 (*Flowers VI*). Evans accepted the first African-American venire person tendered for service, and then peremptorily struck the remaining five African-American panel members. On June 18, 2010, the jury found Mr. Flowers guilty of four counts of capital murder and sentenced him to death. Mr. Flowers appealed his convictions and sentences.

45. A divided Mississippi Supreme Court affirmed his conviction and sentence on November 13, 2014, and denied rehearing on March 26, 2015. *Flowers v. State*, 158 So. 3d 1009 (Miss. 2014), *reh'g denied (*Mar. 26, 2015). Mr. Flowers filed a petition for certiorari with the United States Supreme Court, seeking review of his conviction and sentence. *See Flowers v. State*, 578 U.S. __, 136 S. Ct. 2157 (2016) (mem.) (petition for certiorari filed June 23, 2015).

46. On June 20, 2016, the United States Supreme Court granted Mr. Flowers's writ of certiorari, vacated the Mississippi Supreme Court's judgment with respect to the direct appeal, and "remanded [the case] to the Supreme Court of Mississippi for further consideration in light of *Foster v. Chatman*, 578 U.S. __, 136 S. Ct. 1737, __ L.E.2d __ (2016)." *Flowers v. Mississippi*, 136 S. Ct. 2157. Mr. Flowers's *Batson* claim was once again back before the Mississippi Supreme Court on direct appeal.

11

47.     A divided Mississippi Supreme Court issued a decision on November 2, 2017, again affirming Mr. Flowers's conviction and sentence on the trial record.  *See Flowers v. State*, 240 So. 3d 1082 (Miss. 2017).  The Court denied rehearing, and the mandate issued on March 1, 2018.  Again, Mr. Flowers petitioned for certiorari on his direct appeal in the United States Supreme Court.

48.     On November 2, 2018, the United States Supreme Court again granted Mr. Flowers's petition for certiorari.  *Flowers v. Mississippi*, 139 S. Ct. 451 (Mem), 202 L.Ed.2d 346 (Nov. 2, 2018).

49.     On June 21, 2019, the United States Supreme Court overturned Mr. Flowers's conviction based on prosecutorial misconduct by Evans.  *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019).  The Court observed that "in the six trials combined, the State struck 41 of the 42 black prospective jurors it could have struck," *id.* at 2251, in a "relentless, determined effort to rid the jury of black individuals," *id.* at 2246.

50.     On December 16, 2019, after decades of litigation, Judge Joseph Loper, granted Mr. Flowers bail.  Judge Loper noted that the case against Mr. Flowers was foundationally infirm, recognizing "the case is wholly a circumstantial evidence case" and "the State of Mississippi is faced with the prospect of having to present a far weaker case to the jury than it's had in the past while having to meet a higher burden of proof than it's ever had to meet."  Hr'g Tr. 38, 39, *State v. Flowers*, No. 2003-0071-CR (Miss. Cir. Dec. 16, 2019).

51.     In January 2020, Evans withdrew from the case and requested that the judge turn over prosecution to the Mississippi Attorney General's office, which the court did.

52.     Thereafter, the Mississippi Attorney General's office conducted "a thorough review of the case" and, on September 4, 2020, filed a motion to dismiss the charges, stating that "it is in

the interest of justice that the State will not seek an unprecedented seventh trial of Mr. Flowers." Mot. of the State to Dismiss the Indictment Against Curtis Giovanni Flowers at 2–3, *State v. Flowers*, No. 2003-0071-CR (Miss. Cir. Sept. 4, 2020). The State observed that, "[a]s the evidence stands today, there is no key prosecution witness that incriminates Mr. Flowers who is alive and available and has not had multiple, conflicting statements in the record." *Id.* at 2. The State also recognized that "the Court was made aware of alternative suspects with violent criminal histories, as well as possible exculpatory evidence not previously considered." *Id.* Judge Loper granted the motion and dismissed the case against Mr. Flowers with prejudice, barring further prosecution, freeing Mr. Flowers, and bringing the case to a conclusion in Mr. Flowers favor.

53. Following the conclusion of Mr. Flowers case, he received the maximum compensation available Mississippi's wrongful conviction statute, which required Mr. Flowers to prove that he "did not commit the felony or felonies for which he was sentenced." Miss. Code. Ann. § 11-44-7. *See also* Miss. Code. Ann. §§ 11-44-1 to -15.

### Defendants' Repeated Misconduct

54. Given the absence of any solid evidence against Mr. Flowers, Defendants engaged in repeated misconduct to fabricate a case that never should have been brought. Much of the misconduct was committed by Doug Evans. Some of that misconduct occurred in his role as a prosecutor, but much of the misconduct occurred in his role as an investigator working in conjunction with the other three defendants. This investigative misconduct includes (but is not limited to) pressuring witnesses to fabricate claims about seeing Mr. Flowers in particular locations on the day of the murders, using an unduly suggestive photo line-up to persuade one witness to incriminate Mr. Flowers, failing to thoroughly investigate other suspects who were much more likely to have committed these murders than Curtis Flowers (and concealing the investigation that

13

was done), failing to send a firearm that may have been the murder weapon to the Mississippi crime lab for further investigation, and persuading a career criminal to claim falsely that Mr. Flowers confessed in prison.

55.     In the course of their investigation, Defendants Evans and Johnson, persuaded a career criminal named Odell Hallmon to fabricate testimony and testify in trials three through six that Mr. Flowers confessed to him. Hallmon had previously testified in Mr. Flowers's second trial on behalf of Mr. Flowers, stating that his sister, key prosecution witness Patricia Sullivan-Odom, had fabricated her testimony to obtain a cash reward offered by police.

56.     However, in 2001, while *Flowers II* was on appeal, Hallmon was in jail and awaiting indictment on his drug and robbery charges. Defendants Evans and Johnson contacted Hallmon about the Flowers case. Evans asked Hallmon about Mr. Flowers, telling Hallmon that he had a chance to "make it right."

57.     Hallmon then changed his story in conversations with Evans and Johnson, and in *Flowers III*, *IV*, *V,* and *VI*, Odell Hallmon testified for the State that he had been incarcerated with Mr. Flowers and that during that time, Mr. Flowers "admitted [to Hallmon] that he killed the people at Tardy Furniture." *Flowers VI* Tr. 2415–16. Hallmon was the prosecution's most critical witness, as his testimony supplied the only direct evidence against Mr. Flowers.

58.     At Evans's prompting, Hallmon also falsely claimed that he was not testifying in exchange for benefits. *See Flowers III* Tr. 1661; *Flowers IV* Tr. 423, *State v. Flowers*, No. 2003-0071-CR (Miss. Cir. 2007) ("*Flowers IV* Tr."); *Flowers V* Tr. 436–37, *State v. Flowers*, No. 2003-0071-CR (Miss. Cir. 2008); *see also Flowers VI* Tr. at 2472–73.

59.     Hallmon has since admitted that his statements were manufactured in exchange for leniency from Evans. In a recorded interview with the podcast *In the Dark*, Hallmon explained:

"As far as [Mr. Flowers] telling me he killed some people, hell, naw, he ain't ever told me that. That was a lie. I don't know nothing about this shit. . . . All this shit was a just a fantasy. All of it was just a fantasy, that's all. A bunch of fantasies. A bunch of lies."

60.     Hallmon explained that the extraordinary favors Evans did for him with respect to his many criminal charges persuaded him to implicate Curtis Flowers and repeatedly provide false testimony in exchange for a more lenient sentence. "I was a local drug dealer. I used to get jammed up like every month. . . . I get locked up. I call Doug Evans. . . . Doug Evans say he would rather have a murderer in prison than a drug dealer. . . . I used them son of a bitches just like they used me." And "I helped them. They helped me. That's what[] it[] all boiled down to."

61.     The notion that Curtis Flowers, a person with no criminal record and who went on to have a spotless prison record, would be bragging about committing a murder to the likes of Odell Hallmon made absolutely no sense. Despite knowing that Hallmon's new story was untruthful, Evans and Johnson persuaded him to tell it and stick to it through an extraordinary series of favors.

62.     One week after his May 7, 2001 videotaped interviews where he implicated Mr. Flowers, a case against Hallmon for armed robbery was dismissed. Then he got out of two drug charges. Later, he got out of another armed robbery charge and a drive-by shooting charge. Eventually he pled guilty to a separate drug charge as part of a package where another drug and a firearms charge were both dismissed. He was then released early from prison; the District Attorney declined to seek the habitual offender enhancement for which Hallmon was well qualified. While in prison over the years, Hallmon racked up more than eighty disciplinary incidents, including one month in which he had a razor in his cell, had a "spear" in his cell, and assaulted an officer. After early release, he was charged with aggravated assault on a police officer as he attempted to flee a

suspected drug transaction. But at Evans's urging, he was released on minimal bail and the trial was delayed. While released on bail, he went on to murder three people. While keeping him wedded to this bogus story over the years, Evans instructed him to lie and claim that he was not doing this because of the favors he had received or the favors he expected in the future.[1]

63.     Defendants' unseemly investigative tactics also included pressuring several witnesses to testify in line with the investigator's plan to pin this on Curtis Flowers. A key feature of the case against Mr. Flowers was testimony from witnesses who purportedly saw Mr. Flowers walk from his home to Doyle Simpson's parked car at the Angelica clothing factory, where he purportedly stole Simpson's .380 caliber pistol, and then walked to Tardy Furniture and back home. Police cars were sent to retrieve witnesses several weeks after the murders and drive them to the police station as if they were suspects themselves. Once there, Defendants made it clear what wanted them to say. As Ed McChristian explained: "They had it down pat for me." Or as Clemmie Fleming said about John Johnson: "[H]e wouldn't listen. . . . He was in my face . . . . He was like, you're going to jail and you'll get your baby took from you . . . saying all kinds of stuff to me."

64.     Clemmie Fleming, a resident of Winona, first talked to John Johnson about nine months after the murders.

65.     Fleming told Johnson she had seen Mr. Flowers near Tardy Furniture but did not remember which day it was.

---

[1] Hallmon was the third jailhouse snitch the State used in its prosecution of Mr. Flowers. The State presented similar testimony in *Flowers I* from Frederick Veal and Maurice Hawkins, each of whom claimed to have heard Mr. Flowers confess at different times. *See Flowers I*, 773 So. 2d at 314. Both witnesses, however, subsequently recanted, admitting that their testimony was false. At the last minute, Veal tried to back out of testifying and Evans and Johnson threatened to charge him with perjury if he did not go through with his false testimony against Mr. Flowers.

66.     Johnson, however, would not listen to Fleming.  Instead, he pressured her to say she had seen Mr. Flowers specifically on the morning of the murders.  According to Fleming, Johnson told her she would go to jail and have her child taken away if she did not state she saw Mr. Flowers running away from Tardy Furniture on the day of the murders.

67.     In April 1996, at Johnson's urging and with the full knowledge of Evans, Fleming gave a recorded statement stating she saw Mr. Flowers running away from Tardy Furniture on the morning of July 16, 1996.  Both Johnson and Evans knew that she did not remember which day she saw Flowers.  She then falsely testified in all six trials that on the morning of July 16, 1996, she saw Mr. Flowers running away from Tardy Furniture.

68.     Fleming was the only eyewitness who testified to having seen Mr. Flowers near Tardy Furniture immediately after the murders.

69.     In 2019, Fleming disavowed her testimony in a recorded interview, confirming what she originally told John Johnson—that she was not actually sure what day she saw Mr. Flowers near Tardy Furniture.

70.     Ed McChristian, also a resident of Winona, first spoke to Johnson about a month after the Tardy Furniture Murders, on August 15, 1996.

71.     Like Clemmie Fleming, McChristian was approached by investigators, who picked him up and took him the police station.  Police explained to him "that they wanted to know if [he] had seen Curtis Flowers."

72.     McChristian told Johnson that Mr. Flowers had walked by his house at some point in the summer of 1996, but he did not remember which day.  In response, Johnson told McChristian that an unnamed individual had told law enforcement that McChristian saw Mr. Flowers on July 16, 1996.

73.     McChristian explained in an interview with *In the Dark*, "They had it down pat for me. So all I had to do was go there, and they asked me a question and I answered it. . . . Somebody had told [the investigators] I seen him, so I couldn't say I didn't see him."  McChristian was asked directly, "if you hadn't been called in there, and they hadn't said like, 'July 16th, 1996' would you have even remembered that day?"  He answered, "No."  Ed McChristian falsely testified in all six trials as to Mr. Flowers's whereabouts on the day of the murders, saying that he saw Mr. Flowers "[g]oing north" on Academy Streets—away from Angelica and toward Connie Moore's house—"[b]etween 7:30 and 8:00."  *See, e.g.*, *Flowers VI* Tr. at 2301-02.

74.     McChristian did not actually know whether Mr. Flowers walked past his house on the morning of the Tardy Furniture murders.  Instead, he only recalled seeing Mr. Flowers at some point that summer.  He lied because John Johnson pressured him and told him that he had to.  This was done with the full knowledge of Doug Evans.

75.     Catherine Snow claimed to have seen Mr. Flowers around 7:15 AM on the morning of the murders, standing next to the car of Doyle Simpson, who later that morning said that his gun was stolen from the glove compartment of his car, which had been pried open.  She and Simpson both worked at the Angelica clothing factory.

76.     Snow testified that on the morning of July 16th, she went outside shortly after arriving at work to move her car and saw Flowers standing next to Simpson's car in the parking lot.  *Flowers VI* Tr. at 2221–22.  Although Snow later testified that she knew it was Flowers and "figured it was [Flowers]" who committed the Tardy Furniture murders, she did not report she saw Flowers until a month after the crime and after a $30,000 reward had been posted.  *See, e.g.*, *Flowers VI* Tr. at 2224–25, 2235, 2245–46.

18

77. Snow's claim of seeing Flowers at 7:15 AM has been contradicted by a co-worker and is also contradicted by Simpson's own testimony that he went out to his car around 9:15 AM on that morning and again around 10:25 AM and noticed nothing amiss. *Flowers VI* Tr. at 2332–33. It was only during his third trip, which was at "something-to-11," that he noticed signs of a break-in. *Id.* at 2334–36. His glove compartment had been pried open. *Id.* at 2092, 2335. This was nearly an hour after the Tardy Furniture murders were reported.

78. James Edward "Bojack" Kennedy also testified that he saw Curtis Flowers that morning along the prosecution's purported route. *Flowers VI* Tr. at 2288–90. However, like Catherine Snow, Kennedy only approached law enforcement with information on September 17, 1996, two months after the murders, and over a month after a substantial cash reward had been offered for information. *Id.* at 2291–92. When later asked why he gave his first statement more than two months after the murders, Kennedy responded "I ain't at liberty to say. Bad as I want to tell you, but I'm not at liberty to say. . . . I'm looking at in the back of my mind, it's telling me not to talk no more."

79. Beneva Henry also testified in *Flowers III* that she saw Curtis Flowers that morning along the prosecution's purported route.[2] (*See Flowers VI* Trial Ex. S-128 at 1319–25 (Prior Testimony of Beneva Henry from *Flowers III* (Feb. 7, 2004) ("BH Tr.")). But it appears Henry did not report this to law enforcement until they approached her about six weeks after the murders. *Id.* at 1322.

80. Mary Jeanette Fleming is another "route witness" who did not come forward on her own. Instead, police came to her workplace at McDonald's seven months after the murders, picked her up, took her to the police station, and began the interview with Matthews by asking her if he

---

[2] Because she died prior to Trial VI, her testimony from Trial III was read into the record.

saw Curtis Flowers on the day of the murders. *See Flowers VI* Tr. at 2316–17. As with other witnesses, they brought up his name before she did and let her know what they wanted to hear. *See id.* at 2316–18.

81. The State produced six witnesses—Snow, Patricia Sullivan-Odom, Ed McChristian, James Edward Kennedy, Beneva Henry, and Mary Jeanette Fleming—who allegedly saw Curtis Flowers traversing the prosecution's purported route on the morning of the crime. But their stories were wildly inconsistent. Each witness who described Mr. Flowers reported him wearing different clothing. One witness saw him wearing "some black . . . wind suit pants, nylon, and . . . a white shirt[,] . . . the pants w[ere] . . . unzipped at the leg." *Flowers VI* Tr. at 2045–46 (testimony of Sullivan-Odom). Another saw him wearing "white pants and a black sweater." *Id.* at 2293 (testimony of Kennedy). Another saw him wearing "[b]lack jeans [and a] white shirt." *Id.* at 2238 (testimony of Snow). Another saw him wearing "brown pants . . . a white shirt and a . . . gray jacket." *Id.* at 2313 (testimony of Fleming). And still another saw him wearing "some shorts" that "were white." BH Tr. at 1321–22.

82. Also, these statements are inconsistent in terms of timing. For example, according to the prosecution's theory, Curtis Flowers was at the Angelica factory around 7:15 AM where he stole Doyle Simpson's gun and then walked by the house of Ed McChristian on Academy Street, who testified he saw Flowers "[b]etween 7:30 and 8:00," *Flowers VI* Tr. at 2301–02, and then went to girlfriend Connie Moore's house approximately one mile away. But Patricia Sullivan-Odom testified that Mr. Flowers was near Moore's house at 7:30 AM, *id.* at 2044–45, which meant at best that he traversed that mile by foot in zero minutes.

83. As part of their campaign to pin the Tardy Furniture murders on Curtis Flowers, Defendants failed to thoroughly investigate at least multiple alternative suspects who were much

more likely than Mr. Flowers to have committed this crime. What limited investigation they did into these alternative suspects was repeatedly concealed.

84. The potential suspects include three men from Alabama ("the Alabama Suspects"). In July and August of 1996, Marcus Presley, LaSamuel Gamble, and Steven McKenzie committed a string of crimes, several of which involved similar, execution-style murders and/or shootings. Their modus operandi in each was largely the same: they entered a store in broad daylight; forced the employees to the floor at gunpoint; shot the employees using a .380 handgun, often killing them; and then stole cash and other portable goods.

85. On July 25, 1996, nine days after the Tardy Furniture murders, Presley and Gamble entered a pawn shop in Shelby County, Alabama—just three hours away from Winona—cleaned out the cash register, and killed the two store clerks on duty with precision gunshots to their heads. They used a .380 caliber handgun. That gun also jammed repeatedly, requiring Presley, the shooter, to manually clear the gun on several occasions.

86. Despite the marked similarities between the Alabama Suspects crimes and the Tardy Furniture murders, Defendants failed to meaningfully investigate the Alabama Suspects. They failed to interview Presley, Gamble, or McKenzie, failed to obtain and conduct testing of the .380 handgun, and failed to interview third-parties that might have knowledge of their whereabouts.

87. Had Defendants investigated the Alabama Suspects, they likely would have obtained information directly relevant to their investigation. Indeed, an affidavit from Presley obtained during Mr. Flowers post-conviction proceedings attests that Gamble and McKenzie went to Mississippi for several days—between July 10 and July 17, 1996—carrying a .380 handgun. When Gamble returned from Mississippi, he had money he did not have before he went to

Mississippi and told Presley that he "saw a few licks while they were in Mississippi. By licks he meant places to rob."

88.     Instead, Defendants minimal investigation consisted of sending a copy of the Fila Grant Hill shoe print recovered from Tardy Furniture to the lead investigator directing the manhunt for Presley and Gamble after the pawnshop murders; Miller putting a photograph of Presley in the photo array shown to eyewitness Porky Collins, who had told police that he saw two men arguing in front of Tardy Furniture on the morning of the crime, on August 24, 1996; and investigators showing Roxanne Ballard, daughter of Ms. Tardy, photographs of jewelry recovered from investigations of Presley, Gamble, and McKenzie and asked if she recognized it.

89.     Defendants failed to disclose any of this information. The investigative files turned over during discovery before Mr. Flowers's trial do not contain a single reference to the Alabama Suspects or Presley, Gamble, or McKenzie individually.[3]

90.     Defendants also failed to thoroughly investigate another suspect, Willie James Hemphill—who lived three blocks from Tardy Furniture, had a lengthy criminal history, was allegedly seen near the store the day of the murders, and wore size 9 or 10 Fila Grant Hill shoes— the same shoes as the shoeprint recovered at the crime scene.

91.     Hemphill was questioned by Defendants, but Defendants simply failed to follow up on that investigation. Namely, Defendants failed to verify the alibi Hemphill gave investigators, failed to record interviews—if any occurred—from witnesses who saw Hemphill near Tardy

---

[3] Defendants also repeatedly denied familiarity with the Alabama Suspects. Johnson testified under oath that he was "not familiar with another suspect," and that Mr. Flowers "was the only one that was an initial suspect." *Flowers VI* Tr. at 383, 2935. Miller was asked whether any "persons of interest" were included in the photo arrays shown to Porky Collins. He testified that the only persons of interest were Doyle Simpson and Curtis Flowers—failing to mention that he had also included a photo of Marcus Presley in that array. *Id.* at 3014–17.

Furniture, and failed to adequately test Hemphill's Fila Grant Hill shoes for potential connection to the Tardy Furniture crime scene.

92.    Lastly, Defendants failed to adequately investigate the man whose gun was allegedly used in the murders and the known criminals in his family.

93.    Around 11:00 AM on the morning of the murders, Doyle Simpson claimed in a local restaurant that his gun had been stolen from his car. *See Flowers VI* Tr. at 2757–58, 2775. Doyle testified that he went out to his car in the Angelica parking lot around 9:15 on that morning and again around 10:25 and noticed nothing amiss. *Id.* at 2332–33. It was only during his third trip, which was at "[s]omething-to-11," that he noticed the glove compartment had been pried open and his gun was gone. *Id.* at 2334–35.[4] This was nearly an hour after the Tardy Furniture murders were reported.

94.    Moreover, Doyle admitted on cross-examination that he did not always keep his gun in his glove compartment, that it was "very unusual" for him to have had his gun in his car while at work, and that Curtis Flowers "did not" know that he had it in the glove compartment that day. *Id.* at 2355–56, 2358.

95.    If Doyle Simpson's gun was the murder weapon, as Defendants later claimed at trial, it points toward Doyle himself, either as a party to the murder or as an accessory to murder committed by others—in particular, his cousins, twin brothers Walter Simpson and Wallace Simpson. Defendants failed to investigate Doyle, Walter, and Wallace as suspects, despite Doyle's association with the alleged murder weapon and Walter and Wallace's criminal histories.

---

[4] A law enforcement officer who examined the glove compartment later testified that it "had been pryed open" and "[y]ou couldn't shut it back." *Id.* at 2777. Another officer said "[i]t looked like a screwdriver had been used or a tire iron." *Id.* at 2092.

96.     Walter committed at least one of the bank robberies in the 1995-1997 crime spree in Montgomery County, which included disarming security systems and attempting to blowtorch the safe open at a bank in November 1997.  Walter also committed several other robberies, including commercial establishments, and has a record of burglary and violence, including a recent capital murder conviction for killing his wife and step-daughter.

97.     His twin brother Wallace also has a criminal record including the rooftop break-in of a store in Grenada.  Doyle, Walter and Wallace all lived near each other on Poor House Road in Grenada.

98.     Charles "Porky" Collins's identification of Doyle in a photograph lineup further suggested Doyle's involvement.  Simpson testified that while running errands on the morning of the murders, he saw two black men standing outside of Tardy Furniture near a dirty, brown or tan-colored car "somewhere around a little bit before 10:00 to a few minutes after 10:00." *See Flowers VI* Trial Ex. S-115 at 1610, 1639 (Prior Testimony of Porky Collins (Mar. 24-25, 1999)) [hereinafter "PC Tr."].  He testified that he did not see the face of one and only got a "brief glimpse" of the face of the other. *Id.* at 1640.  Collins spoke with law enforcement on the day of the murders, during which he described the man he had seen as simply black with a "medium complexion." *See Flowers II* Trial Ex. D-5 (John Johnson's notes of initial Porky Collins interview).

99.     No one asked Collins to try to identify the man he said he had "briefly glimpsed" until *six weeks later*, when investigators showed him two photo arrays. *See Flowers VI* Trial Tr. at 3014, 3017.  According to Miller, Collins indicated that the photo of Doyle Simpson in the first array "looks like the person he'd seen." *Id.* at 3031.

24

100.     Johnson and Miller—then showed Collins a second array, which contained a photo of Curtis Flowers but excluded the photo of Doyle Simpson.  Flowers's photo was noticeably larger than those of the others in the array, his face was much closer to the frame than the men in the other photos, and he had a darker complexion than the other men in the array.  After reviewing the second array, an officer said that Collins responded to the photo of Flowers by saying, "I believe that's him, it looks like him."  Law enforcement followed up by suggestively asking, "if he knew Curtis Flowers?"  After that prompting, Collins's prior identification of Doyle Simpson and equivocal identification of Flowers turned into certainty that Curtis Flowers was the man he had seen.

101.     Defendants also failed to test a .380 handgun—the same caliber pistol used to commit the Tardy Furniture murders—which Defendants recovered from a home near Tardy Furniture in 2001.

102.     In October 2001, Jeffrey Armstrong was living with his mother in a house across the train tracks from Tardy Furniture.  One day, their dog discovered a rusty .380 handgun underneath the house—the same caliber pistol used in the Tardy Furniture murders.  Armstrong remembered the murders and placed the gun in a shed behind his house.

103.     Armstrong told Winona police officers that they should come get the gun because it fit the description of the Tardy Furniture murder weapon.  One of them did but Mr. Armstrong never heard from them again.  Upon information and belief, the gun was then given to Evans's office so that it could be sent to the crime lab for testing in connection with the Tardy Furniture murders.  However, the crime lab has no record of receiving it.

104.     Defendants instituted a criminal proceeding against Mr. Flowers without probable cause and Defendants acted maliciously and with reckless disregard in pursuing and prosecuting

25

him.  Defendants had no reasonable grounds to believe Mr. Flowers committed the Tardy Furniture murders at the time of his initial arrest, nor at any time during the 23 years that followed.

105.    The prosecution was instituted for illegitimate reasons as demonstrated by the concentrated campaign by Evans, Johnson, Matthews, and Miller to fabricate and coerce witness testimony implicating Mr. Flowers, avoid any meaningful investigation of alternative suspects, and prevent Black people from serving on the juries.  Upon information and belief, Defendants pursued and prosecuted Mr. Flowers to quell pressure to make an arrest for the Tardy Furniture murders and protect their jobs and reputations, and then stuck with their story for 23 years.

### Impact on Mr. Flowers

106.    Mr. Flowers, who is now 51 years old, has spent nearly half his life on death row at the Mississippi State Penitentiary at Parchman for crimes he did not commit..  His arrest and prolonged imprisonment—much of which was under a sentence of death—along with the marathon of trials, hearings, and in court appearances, deprived him of this freedom and took an unimaginable toll on his mental and physical health.

107.    In an interview discussing the jury's announcement that it was sentencing him to death,  Mr. Flowers said "[i]t was like having the air sucked out of you, you know.  You can't breathe.  I remember one of the deputies said, 'Your mom want to speak with you.'  And she told me, 'Keep your head up and don't give up.  I know it's a lie, you know it's a lie.  Don't give up.'" Alissa Zhu, *I just never stopped fighting': Curtis Flowers, Now a Free Man, Gives His First Interview*, Miss. Clarion Ledger (Oct. 13, 2020), https://www.clarionledger.com/story/news/2020/10/13/in-dark-podcast-air-curtis-flowers-first-interview-since-release/5939911002/

108.    In an interview, Mr. Flowers called life in Parchman the "worst[] thing you ever dreamed about."  Sharyn Aflonsi, *How Curtis Flowers, Tried Six Times For the Same Crime, Was Saved From Death Row*, 60 Minutes (Jan. 3, 2021), https://www.cbsnews.com/news/curtis-flowers-in-the-dark-60-minutes-2021-01-03/.  He elaborated that it was "Yeah, like a nightmare cause, you know, you hear all kinds of noise at night, you know.  Uh, there are inmates who have just snapped.  Some who have lost it. They act up all night."  *Id.*

109.    During his time on death row, other inmates were executed, an experience Mr. Flowers described as "nerve-wracking."

110.    While wrongfully incarcerated, Mr. Flowers missed the death of his mother, with whom he was incredibly close.  He missed her funeral.  He missed seeing his daughter grow up.  He missed countless holidays, birthdays, and daily life with his family and friends..

## VIOLATIONS

111.    The foregoing actions of Defendants violated the rights of Curtis Flowers under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

112.    The foregoing actions of the Defendants also violate Article 3, Sections 14, 23 and 26 of the Mississippi Constitution and constitute the state law torts of malicious prosecution, abuse of process, and false imprisonment.  Defendants acted in reckless disregard of the safety and well-being of Curtis Flowers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CURTIS GIOVANNI FLOWERS respectfully prays that this Court:

A.    Enter a judgment in his favor and against Defendants DOUG EVANS, JOHN JOHNSON, WAYNE MILLER, and JACK MATTHEWS.

B.      Award compensatory damages, attorneys' fees, and costs against each Defendant,

and punitive damages against each of the Defendants in their individual capacity.

C.      Grant such other and further relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff Curtis Giovanni Flowers hereby demands a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.


Dated: September 3, 2021                              Respectfully submitted,

                                                     /s/ Robert B. McDuff.
                                                     Robert B. McDuff (MS Bar No. 2532)
                                                     Mississippi Center for Justice
                                                     767 North Congress Street
                                                     Jackson, MS 39202
                                                     rbm@mcdufflaw.com
                                                     T. (601) 259-8484

                                                     Jonathan L. Abram (*pro hac vice* forthcoming)
                                                     Kathryn Marshall Ali (*pro hac vice* forthcoming)
                                                     W. David Maxwell (*pro hac vice* forthcoming)
                                                     Kaitlyn A. Golden (*pro hac vice* forthcoming)
                                                     HOGAN LOVELLS US LLP
                                                     555 Thirteenth Street NW
                                                     Washington, DC 20004
                                                     T. (202) 637-5600
                                                     F. (202) 637-5910
                                                     kaitlyn.golden@hoganlovells.com

                                                     *Counsel for Plaintiff Curtis Giovanni Flowers*