## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

CURTIS GIOVANNI FLOWERS;

*Plaintiff,*

v.

DOUG EVANS, in his individual capacity,
JOHN JOHNSON, in his individual capacity,
WAYNE MILLER, in his individual capacity,
and JACK MATTHEWS, in his individual
capacity;

*Defendants.*

Civil Action No. 4:21-cv-00110-NBB-JMV
The Hon. Neal B. Biggers Jr.

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT EVANS'S MOTION TO DISMISS

Robert B. McDuff
MISSISSIPPI CENTER FOR JUSTICE
767 North Congress Street
Jackson, MS 39202
rbm@mcdufflaw.com
(601) 259-8484

Jonathan L. Abram (admitted *pro hac vice*)
Kathryn Marshall Ali (admitted *pro hac vice*)
W. David Maxwell (admitted *pro hac vice*)
Kaitlyn A. Golden (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
kaitlyn.golden@hoganlovells.com
(202) 637-5600

*Counsel for Plaintiff Curtis Giovanni Flowers*

## INTRODUCTION

Defendant Doug Evans spent more than two decades wrongfully pursuing Plaintiff Curtis Flowers for the murders of four individuals. This was an investigation built on layers of misconduct that spanned many aspects of the case, starting with the investigation and continuing through six trials. The result of this egregious misconduct was that Mr. Flowers spent nearly half of his life—twenty-three years—behind bars, much of it on death row at Mississippi State Penitentiary at Parchman, for crimes he did not commit.

Evans now seeks to evade responsibility for his wrongdoing by invoking absolute prosecutorial immunity. Evans is right that he is immune from federal claims for his misconduct at trial. But the law is clear that Evans is not afforded absolute immunity for his *investigative* conduct which is the focus of the federal claims in this case. Discovery will show the details of his involvement in every step of the investigation, along with the other investigators, including creation of false testimony and failing to investigate real suspects.

Similarly, Evans cannot escape liability for violations of state law. Contrary to Evans's argument, the state-law tort claims of abuse and process and false imprisonment are not untimely under the circumstances of this case. Mr. Flowers has adequately pled the requisite elements of his malicious-prosecution, abuse-of-process, and false-imprisonment claims. Mr. Flowers's Complaint adequately alleges that Evans acted with malice and without probable cause throughout the investigation, arrest, and six criminal prosecutions of Mr. Flowers, all of which were based on false evidence, and resulted in his wrongful incarceration. This is adequate to plead the state-law tort claims

Mr. Flowers lost over half his life—missing birthdays, holidays, and his mother's funeral—because of Evans's misconduct. He now seeks some measure of justice for the incredible toll his

incarceration took, though this wrong can never truly be rectified.  Evans's Motion to Dismiss should accordingly be denied.

## STATEMENT OF THE CASE

### A.    The Investigation Into The Tardy Furniture Murders

On July 16, 1996, Bertha Tardy, Robert Golden, Carmen Rigby, and Derrick Stewart were shot with a .380 caliber pistol in Tardy Furniture Store in Winona, Mississippi.  *See* Compl., ECF No. 1 ¶ 19 ("Compl.").  Tardy, Golden, and Rigby were found dead on the scene; Stewart died from his gunshot wounds at the hospital about a week later.  *Id.*  The store's cash drawer and safe were also robbed.  *See id.* ¶¶ 5, 28.

District Attorney Doug Evans led and coordinated the investigation into this crime, which involved his office, the Mississippi Highway Patrol, and the Montgomery County Sheriff's Office.  *See id.* ¶¶ 19-20.  Evans was involved in interviewing witnesses immediately following the murders.  *See* Chris Allen Baker, *Cash Reward Offered for Information*, Winona Times, July 25, 1996 ("Since the investigation began, Winona Police officials, District Attorney Doug Evans and state investigators have talked to over 30 people to gain insight to what possibly happened in the store."),

As Defendant and former Mississippi Highway Patrol Lieutenant Jack Matthews later testified, all information about the investigation was "funneled" though Evans's office.  Compl. ¶ 20.  Evans himself later represented to the trial court that, "there was nothing that went on" in the *Flowers* case "that I didn't personally . . . there was nothing that went on in that case that I was not aware of."  *Id.*  Defendant John Johnson, who worked for Evans, was the lead investigator.  *Id.* ¶ 13.  Also involved in the investigation was Defendant and former Mississippi Highway Patrol Lieutenant Wayne Miller.  *Id.* ¶ 14.

In 1996, Mr. Flowers was a 26-year-old gospel singer with no criminal record who had worked at the store for three-and-a-half days, a few weeks before the murders, and was let go for failing to show up to a few shifts. Because of this employment history, Mr. Flowers was questioned by Johnson on the afternoon of the murders. *Id.* ¶ 23. He was not arrested at that time. *Id.*

In fact, no one was arrested that day, or in the weeks that followed. *Id.* ¶ 24. This was not for lack of leads. For example, just eight days before the murders, some person or persons broke through Tardy Furniture's skylight, made their way down into the store, unsuccessfully attempted to break into the safe, and fled through the side door—taking the side-door key with them. *Id.* ¶ 26. Defendants did not explore the connection between this break-in and the Tardy Furniture murders and robbery. *Id.* ¶ 28. Matthews later testified that he did not "know that there was an effort" to connect these crimes. *Id.*

Moreover, the manner in which the victims were killed suggested that the killer had significant firearms training and skill: None of the victims had been restrained at the time of their death, and all had been killed with precise shots from a .380 caliber handgun. *Id.* ¶ 25. Several live rounds were found at the crime scene, suggesting that the handgun had jammed repeatedly. *Id.* Those clues could have pointed the way towards Marcus Presley, LaSamuel Gamble, and Steven McKenzie ("the Alabama Suspects"), three men who were committing a string of similar crimes in the area in the summer of 1996. *Id.* ¶ 84. Several of these crimes involved similar, execution-style murders and/or shootings. *Id.* In one particularly resonant incident, nine days after the Tardy Furniture murders, Presley and Gamble entered a pawn shop three hours from Winona, cleaned out the cash register, and killed the two store clerks on duty with precision gunshots to the head. *Id.* ¶ 85. They used a .380 handgun. *Id.* That gun jammed repeatedly,

requiring the shooter to manually clear the gun several times. *Id.* And an affidavit from Presley obtained during Mr. Flowers's post-conviction proceedings attests that Gamble and McKenzie were in Mississippi at the time of the Tardy Furniture murders and had with them a .380 handgun. *Id.* ¶ 87. This affidavit also attests that when they returned to Alabama the day after the murders, Gamble had cash he had not had when he went to Mississippi, and that Gamble had told Presley that they had seen "places to rob" while in Mississippi. *Id.*

Evans and the other Defendants realized that Presley, Gamble, or McKenzie might have committed the Tardy Furniture murders, yet they only took minimal steps to look into them. And they soon abandoned the effort, never interviewing them, never testing the .380 handgun they used in their crimes, and never interviewing third parties who might have had knowledge of their whereabouts. *Id.* ¶¶ 86, 88. Moreover, Evans and the other Defendants never disclosed the existence of these suspects to Mr. Flowers. *Id.* ¶ 89.

Another potential suspect was Willie James Hemphill, who lived three blocks from Tardy Furniture, had a lengthy criminal history, was allegedly seen near the store the day of the murders, and wore the same shoes as the shoeprint recovered at the crime scene. *Id.* ¶ 90. Defendants did question Hemphill, but they failed to verify the alibi he gave them, failed to record any interviews of witnesses who may have seen him near Tardy Furniture, and failed to test his shoes for potential connections to the crime scene. *Id.* ¶ 91.

Defendants also failed adequately to investigate Doyle Simpson and the members of his family. *See id.* ¶ 92. About an hour after the Tardy Furniture murders were reported, Simpson called the police to report that someone had broken into his car's glove compartment and taken his gun. *Id.* ¶¶ 22, 93-94. Defendants claimed that this gun was the murder weapon, but did not thoroughly investigate whether Simpson or his cousins were the killers, even though one cousin

had a documented history of violence and both of them had lengthy criminal histories that included commercial burglaries. *Id.* ¶¶ 95-100.

Without following up on these leads, the investigation, "funneled" through Evans's office, zeroed in on Mr. Flowers. *See id.* ¶¶ 10, 20, 32. A month after the murders, Defendants picked up a man named Ed McChristian, took him to the police station, and told him "that they wanted to know if [he] had seen Curtis Flowers." *Id.* ¶ 71. He responded that he had seen Mr. Flowers walk by his house at some point in the summer of 1996, but he could not remember which day. *Id.* ¶ 72. Johnson pressured him to lie and claim that it was the day of the murders, and Evans was fully aware of this. *Id.* ¶¶ 70-74. As McChristian later explained, "[t]hey had it down pat for me." *Id.* ¶ 73.

A $30,000 reward for information about the murders was then offered in response to mounting public pressure to make an arrest. *See id.* ¶ 24. Predictably, this offer brought many "witnesses" out of the woodwork. A number of these "witnesses" surfaced or were located by Defendants in the months after the murders and, after prompting by Defendants, claimed to have seen Mr. Flowers along what Defendants later claimed was the route to Tardy Furniture. *Id.* ¶¶ 75-82. The testimony of these witnesses is wildly inconsistent, both with regards to what Mr. Flowers was wearing and where he was at what time (the witnesses saw him in two different locations a mile apart at the same time). *Id.* ¶¶ 81-82. But this was enough for Defendants, who had already decided to build their case against Mr. Flowers despite the absence of any indication he would murder four people with precision shooting and despite the existence of much more likely suspects. *See id.* ¶¶ 4-8.

And then there is Clemmie Fleming, who was one of the prosecution's star witnesses. Fleming first talked to Johnson about nine months after the murders and told him that she had seen

Mr. Flowers near Tardy Furniture at some point but could not remember which day it was. *Id.* ¶¶ 64-65. Johnson told Fleming that she would go to jail and have her child taken away if she did not say she saw Mr. Flowers running away from Tardy Furniture on the day of the murders. *Id.* ¶ 66. Under this pressure, Fleming caved and—with Evans's full knowledge—gave a recorded statement saying what Johnson wanted her to say. *Id.* ¶ 67. Fleming then falsely testified at all six trials that she saw Mr. Flowers running away from Tardy Furniture on the morning of July 16 *Id.* She disavowed this testimony in 2019 in a recorded interview. *Id.* ¶ 69.

### B. The Six Trials of Curtis Flowers and The Manufacture of Odell Hallmon's Story.

Over the course of the next thirteen years, Mr. Flowers was put through the gauntlet of an unprecedented six trials for capital murder for the same set of crimes. *See id.* ¶ 33. Doug Evans continued to lead the effort. *Id.* And Evans engaged in egregious misconduct from end to end. *Id.*

In the first trial (for the murder of Bertha Tardy) and the second trial (for the murder of Derrick Stewart), Mr. Flowers was convicted and sentenced to death. *Id.* ¶¶ 35-36. Both convictions were reversed by the Mississippi Supreme Court because Evans had committed prosecutorial misconduct. *See Flowers v. State*, 773 So. 2d 309 (Miss. 2000) (*Flowers I*); *Flowers v. State*, 842 So. 2d 531 (Miss. 2003) (*Flowers II*).

Before the third trial—where Mr. Flowers was charged with all four capital murders— Evans and Johnson persuaded a career criminal named Odell Hallmon to falsely state that Mr. Flowers had confessed to him. Compl. ¶ 55. Hallmon had initially testified in *Flowers II* that his sister, key prosecution witness Patricia Sullivan-Odom, had fabricated her testimony to obtain the cash reward. *Id.* While *Flowers II* was on appeal, and while Hallmon was in jail awaiting indictment on drug and robbery charges, Evans and Johnson contacted him about the Flowers case

6

and said that he had the chance to "make it right." *Id.* ¶ 56. Evans and Johnson induced Hallmon to change his story and he then testified at trials three, four, five, and six that Mr. Flowers had confessed to him while they had both been incarcerated. *Id.* ¶ 57. Hallmon has since admitted that this story was manufactured—a "bunch of fantasies" and "lies," in his words—in conjunction with Evans and Johnson in exchange for leniency for Hallmon's many crimes past, present, and future. *See id.* ¶ 59-60, 62.

Evans held his end of the bargain. Hallmon later said that, as a local drug dealer, he "used to get jammed up like every month." *Id.* ¶ 60. But he would just "call Doug Evans" who would say that "he would rather have a murderer in prison than a drug dealer." *Id.* As Hallmon explained, "I used them son of a bitches just like they used me"; "I helped them. They helped me. That's what[ ] it[ ] all boiled down to." *Id.* And Evans helped Hallmon a lot. After Hallmon flipped, his two armed-robbery charges were dismissed. *Id.* ¶ 62. So were two drug charges. *Id.* He later got out of another armed-robbery charge and a drive-by shooting charge. *Id.* Hallmon eventually pled guilty to a separate drug charge, but was then released early from prison because the District Attorney had declined to seek the habitual-offender enhancement for which Hallmon was well qualified. *Id.* After this early release, he was charged with aggravated assault on a police officer as he tried to flee a suspected drug transaction. *Id.* At Evans's urging, he was released on minimal bail and the trial was delayed. *Id.* Hallmon murdered three people while out on bail and was quickly offered a plea for life in prison. *See id.* While keeping Hallmon wedded to his bogus story over the years, Evans instructed him to lie and claim that he was not doing this because of the favors he received or the favors he expected in the future. *Id.*

With Hallmon's false claim, which led to his false testimony, Mr. Flowers was sentenced to death in the third trial. *Id.* ¶¶ 39-40. The Mississippi Supreme Court reversed this conviction

and sentence on the basis of egregious prosecutorial misconduct, including overt racial discrimination by Evans in his exercise of peremptory challenges, which the court called "as strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge." *Flowers v. State*, 947 So. 2d 910, 935 (Miss. 2007) (*Flowers III*).

Mr. Flowers's fourth and fifth trials ended in hung juries. Compl. ¶¶ 42-43.

Mr. Flowers was then tried a sixth time, in June 2010, where he was again found guilty of four counts of capital murder and sentenced to death. *Id.* ¶ 44. Mr. Flowers's conviction was ultimately overturned by the United States Supreme Court based on Evans's prosecutorial misconduct. *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019). The Court observed that "in the six trials combined, the State struck 41 of the 42 black prospective jurors it could have struck," *id.* at 2251, in a "relentless, determined effort to rid the jury of black individuals." *Id.* at 2246.

Circuit Judge Joseph Loper granted Mr. Flowers bail in December 2019. Compl. ¶ 50. In so doing, he noted that the case against Mr. Flowers was foundationally infirm. *See id.*

In January 2020, Evans withdrew from the case and requested that the judge turn prosecution over to the Mississippi Attorney General's office, which the court did. *Id.* ¶ 51. The Mississippi Attorney General's Office then conducted "a thorough review of the case" and in September 2020, filed a motion to dismiss the charges. *Id.* ¶ 52. The State explained that, "[a]s the evidence stands today, there is no key prosecution witness that incriminates Mr. Flowers who is alive and available and has not had multiple, conflicting statements in the record." *Id.* The State also recognized that "the Court was made aware of alternative suspects with violent criminal histories, as well as possible exculpatory evidence not previously considered." *Id.* Judge Loper granted the motion on September 4 and dismissed the case against Mr. Flowers with prejudice. *Id.*

### C.     This Case

On September 3, 2021, Mr. Flowers filed a complaint against Evans, Johnson, Miller, and Matthews.  The Complaint alleges that Evans violated Mr. Flowers's Fourth, Sixth, and Fourteenth Amendment rights under the U.S. Constitution, as well as his rights under Article 3, Sections 14, 23, and 26 of the Mississippi Constitution, by manufacturing false witness statements, *id.* ¶¶ 54-61; by failing to investigate more likely suspects and send a potential murder weapon to the Crime Lab for testing, *id.* ¶¶ 8, 28, 83-95, 101-03; by suppressing the evidence of alternative suspects, *id.* ¶ 89; by suppressing the evidence of impeachment evidence against Odell Hallmon, *id.* ¶ 58; by improperly striking Black jurors at all six trials, *id.* ¶¶ 35-36, 40, 42, 44; and by illegally detaining Mr. Flowers, *id.* ¶¶ 104-05; *see also id.* ¶¶ 111-12.  It also alleges that these actions constitute the state-law torts of malicious prosecution, abuse of process, and false imprisonment.  *Id.* ¶ 112.

On October 22, 2021, Evans moved to dismiss.  *See* ECF No. 7.  Evans argued that he was entitled to absolute prosecutorial immunity for the federal and state-law claims again him.  ECF No. 8 at 1 ("Evans Mem.").  He also argued that the state-law claims are barred by the Mississippi Tort Claims Act ("MTCA"), the wrongful-conviction statute, and the applicable statutes of limitation, and that they are inadequately pled.  *Id.*

### STANDARD OF REVIEW

When reviewing a complaint to determine its sufficiency under Federal Rule of Civil Procedure 12(b)(6), a court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff."  *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014).  To survive a Rule 12(b)(6) motion to dismiss, a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The court is required only to "determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Thompson*, 764 F.3d at 503 (internal quotations omitted).

"In determining immunity, [courts] accept the allegations of [the plaintiffs'] complaint as true." *Singleton v. Cannizzaro*, 956 F.3d 773, 779 (5th Cir. 2020) (quoting *Loupe v. O'Bannon*, 824 F.3d 534, 536 (5th Cir. 2016)). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

## ARGUMENT

## I. EVANS IS NOT ENTITLED TO ABSOLUTE IMMUNITY FOR CONDUCT OUTSIDE HIS PROSECUTORIAL DUTIES.

### A. Prosecutorial Immunity Does Not Apply When A Prosecutor Functions as an Investigator.

Absolute immunity does not bar all lawsuits against prosecutors for misconduct. *Buckley*, 509 U.S. at 273 ("[A]s the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor."). A prosecutor is afforded only qualified immunity for acts performed in the course of "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Loupe*, 824 F.3d at 539 (quoting *Buckley*, 509 U.S. at 273).

In examining whether absolute immunity applies, courts apply a "functional approach," which looks to "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (internal quotations omitted). "Thus, 'the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.'" *Singleton*, 956 F.3d

10

at 779 (quoting *Loupe*, 824 F.3d at 538). Instead, a prosecutor is absolutely immune for initiating and pursuing a criminal prosecution, for actions taken in his role as "advocate for the state" in the courts, or when his conduct is "intimately associated with the judicial phase of the criminal process." *Loupe*, 824 F.3d at 539 (internal quotations omitted). By contrast, "when a prosecutor acts outside his quasi-judicial role," the policy justifications underlying absolute immunity are inapplicable and a prosecutor is no longer entitled to absolute immunity. *Singleton*, 956 F.3d at 780-81 (internal quotations omitted).

Investigative conduct falls outside the "quasi-judicial role" and is not entitled to absolute immunity. *See Buckley*, 509 U.S. 273 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973))); *Hoog-Watson v. Guadalupe Cnty.*, 591 F.3d 431, 439 (5th Cir. 2009) (finding prosecutor was not entitled to absolute immunity when prosecutor was "part of the effort to assemble the evidence"); *see also Castellano v. Fragozo*, 352 F.3d 939, 958 (5th Cir. 2003) ("Courts have also held that non-testimonial pretrial actions, such as the fabrication of evidence, are not within the scope of absolute immunity because they are not part of the trial."). Investigatory conduct includes manufacturing evidence, *Castellano*, 352 F.3d at 958, participation in illegal searches and seizures, *Marrero v. Hialeah*, 625 F.2d 499, 505-06 (5th Cir. 1980), *cert. denied sub nom. Rashkind v. Marrero*, 450 U.S. 913 (1981); and giving legal advice to the police, *Loupe*, 824 F.3d at 540.

The timing of the prosecutor's actions does not control whether misconduct is shielded by absolute immunity. *Singleton*, 956 F.3d at 783 ("The Supreme Court has never held that the timing of a prosecutor's actions controls whether the prosecutor has absolute immunity."); *see also*

*Buckley*, 509 U.S. at 274 n.5 ("Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards."). Conduct can still be investigatory—and therefore not shielded by absolute immunity—even after a suspect has been identified and a finding of probable cause made. *Singleton*, 956 F.3d at 783 (finding that use of fake subpoenas after charges had been filed was investigatory conduct and not shielded by absolute immunity).

Moreover, a prosecutor cannot retroactively immunize constitutionally wrongful conduct by claiming it was "preparation" for trial. *See Buckley*, 509 U.S. at 276 ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial."); *Wooten v. Roach*, 964 F.3d 395, 409 (5th Cir. 2020) ("Prosecutors 'may not shield [their] investigative work with the aegis of absolute immunity merely because,' in hindsight, 'that work may be . . . described as 'preparation' for a possible trial.'" (alterations in original) (quoting *Buckley*, 509 U.S. at 276)). Allowing otherwise would "lead to the untenable result that officials who fabricate evidence or manufacture probable cause could later shield themselves from liability simply by presenting false testimony regarding that evidence." *Spurlock v. Satterfield*, 167 F.3d 995, 1004 (6th Cir. 1999).

**B.** **Much of Evans's Misconduct Was Outside the Scope of His Prosecutorial Duties.**

Evans claims that absolute immunity precludes liability for "two categories" of misconduct alleged in the Complaint: his failure to identify and investigate alternative suspects and his manufacturer of witness statements. Evans Mem. at 8-18. He is wrong on both counts. Both categories of misconduct were committed in an investigative capacity, and the purpose of both was

not to prepare for trial, but to mine for information. That is quintessential investigative conduct.[1] *See Simon v. City of New York*, 727 F.3d 167, 172-74 (2d Cir. 2013) (holding that investigative interviews by prosecutors are not entitled to absolute immunity); *see also Hoog-Watson*, 591 F.3d at 438 (prosecutor's participation in a search and seizure was investigative and hence not absolutely immune).

      1.    Evans's failure to investigate alternative suspects and exculpatory evidence is unshielded investigative conduct.

Evans's extensive role in the investigation of the Tardy Furniture murders prevents him from benefiting from qualified immunity. Evans, relying on case law largely outside the Fifth Circuit, suggests that prosecutors are entitled to absolute immunity for a failure to investigate, suggesting a failure to investigate is analogous to an evaluation of the evidence and preparation for trial. Evans Mem. at 10-14; *id.* at 11.

As alleged in the Complaint, Evans played a significant role in the investigation. Compl. ¶ 54. Moreover, the investigation was "funneled" though his office, *id.* ¶ 20 and as he later represented to the circuit court, "there was nothing that went on" in the *Flowers* case "that I didn't personally . . . there was nothing that went on in that case that I was not aware of." *Id.* Evans's role constituted classic investigative conduct: He was clearly involved in assembling evidence, including the manufacture of the phony story told by Odell Hallmon, the man who became the key prosecution witness. *Id.* ¶¶ 55-62. Evans was aware of exculpatory evidence, including the people who were more likely suspects than Curtis Flowers, and the potentially exculpatory evidence about a firearm. He deliberately failed to investigate those suspects and send the firearm to the crime

---

[1] If the Court believes there is an open question as to whether Evans's conduct was investigative or prosecutorial, the appropriate remedy is to deny the motion to dismiss and allow for discovery. *See Twombly*, 550 U.S. at 556 (recognizing that a complaint is "plausible" if it includes enough facts to create a reasonable expectation that discovery will produce evidence in support of a claim).

lab. *Id.* ¶¶ 83-103. This is all investigative. *See Singleton*, 956 F.3d at 780-81; *Hoog-Watson*, 591 F.3d at 439 (finding prosecutor was not entitled to absolute immunity when prosecutor was "part of the effort to assemble the evidence"); *Terwilliger v. Reyna*, 4 F.4th 270, 281 (5th Cir. 2021) (finding prosecutor was not entitled to absolute immunity when he was "constantly in touch [with law enforcement] as the investigation proceeded and had access to allegedly exculpatory video and interview evidence" but still issued an arrest warrant).

Moreover, the case law relied on by Evans is inapposite. *Woolfolk* was brought by a crime victim, arguing that the prosecutor failed to investigate his assault allegations. *Woolfolk v. Thomas*, 725 F. Supp. 1281, 1282-83 (N.D.N.Y. 1989). *Watson* likewise was a suit brought by sexual-assault victim arguing that the prosecutor failed to investigate her complaints. *Watson v. Bush*, No. 09-cv-1871, 2010 WL 1582228, at *5 (N.D. Ill. Apr. 20, 2010). *Halpren* involved allegations that the prosecutor failed to conduct an *independent* investigation of the evidence. *Halpern v. City of New Haven*, 489 F. Supp. 841, 843 (D. Conn. 1980).

And *Wooten v. Roach* is instructive—but not for the reasons Evans suggests. *See* Evans Mem. at 11-12. *Wooten* involved the conduct of multiple prosecutors in the Collin County District Attorney's Office and the Texas Attorney General's Office in using a grand jury to investigate and seek charges against a political rival. *Wooten*, 964 F.3d at 399. The court found the head of the Collin County Special Crimes Unit—the prosecutor actually leading the investigation and issuing grand jury subpoenas—was *not* entitled to absolute immunity, because his conduct was clearly investigatory. *Id.* at 408. Evans's arguments only focus only on the Collin County District Attorney, who the court found was entitled to absolute immunity because he did not oversee the investigation, did not participate in it, and was merely "aware" in a general sense that it was ongoing. *Id.* at 409-10. Evans suggests his misconduct here is akin to that of the District Attorney,

14

suggesting he merely was aware of the investigative failures surrounding the Tardy Furniture murders, not that he participated in the failure. *See* Evans Mem. at 12. This is wrong. Here, as the Complaint alleges, Evans was directly involved in the investigation and was involved in much of the investigatory misconduct in the case. *See* Compl. ¶¶ 54-61, 83-95, 101-03; *see also* Chris Allen Baker, *Cash Reward Offered for Information*, Winona Times, July 25, 1996 (describing Evans's role in talking to witnesses early in the investigation).

Accordingly, Evans's active involvement in the investigation of the Tardy Furniture murders means his actions should not be shielded by absolute immunity.

> 2. Evans's involvement in the falsification of witness statements is investigative conduct.

As alleged in the Complaint, Evans was directly involved in the manufacture of Odell Hallmon's false claim and approved the pressuring of other so-called witnesses, including the manufacture of the claims of Clemmie Fleming and Ed McChristian. *See* Compl. ¶¶ 55-63, 67, 74. Evans argues that these efforts are shielded by prosecutorial immunity. Evans Mem. at 15-18. Not so. His efforts were in the realm of information gathering, not preparation for trial. Evans correctly notes that his decision to *present* false testimony of multiple witnesses at trial was shielded by prosecutorial immunity, *id.* at 14-15, and we do not claim otherwise. But presenting false testimony does not shield Evans from liability for his role in the *creation* of that false testimony. *See Fields v. Wharrie*, 740 F.3d 1107, 1113-14 (7th Cir. 2014) (holding that prosecutor's fabrication of evidence is not subject to absolute immunity, regardless of whether he introduced the fabricated evidence at trial, because to "retroactively immunize himself" would "create a license to lawless conduct" (internal quotations omitted)); *McGhee v. Pottawattamie Cnty.*, 547 F.3d 922, 932-33 (8th Cir. 2008) (holding that the fabrication of evidence is distinct from its use at trial and not susceptible to absolute immunity); *Zahrey v. Coffey*, 221 F.3d 342,

354-55 (2d Cir. 2000) (holding that a prosecutor's fabrication of evidence is a constitutional tort to which absolute immunity does not apply, even if the injury did not occur until that same prosecutor used the fabricated evidence at trial).

Central to Evans's argument is *Cousin v. Small*, 325 F.3d 627 (5th Cir. 2003). Like here, the plaintiff in *Cousin* was convicted and served time on death row before his conviction was overturned because of prosecutorial misconduct. *Id.* at 629-30. There, the prosecutor induced a James Rowell, a friend of Cousin's, to testify against Cousin, by first contacting Rowell's lawyer. *Id.* at 634-35. Rowell's lawyer then told Rowell that "you need to give up [Cousin] on the murder." *Id.* at 634. The prosecutor subsequently met with Rowell and provided "the questions [Rowell] would be asked in court and the answers." *Id.* The Court found that the prosecutor was acting as an advocate because the conduct was done for the "state's case at the pending trial." *Id.*

Evans suggests this case is "indistinguishable" from *Cousin* because Mr. Flowers had already been indicted at the time Evans and Defendant John Johnson manufactured a false narrative for Odell Hallmon. Evans Mem. at 17. But this case is very different from *Cousin*. Instead, this case is akin to a more recent Fifth Circuit case, *Singleton*. In *Singleton*, the prosecutor-defendants used a series of fake subpoenas to compel crime victims and witnesses to speak to the prosecutor. *Singleton*, 956 F.3d at 782-83. The Fifth Circuit found this conduct was investigative—not prosecutorial—because it was used for information gathering. *Id.* ("Investigation . . . ha[s] historically and by precedent been regarded as the work of police, not prosecutors, and [it does] not become [a] prosecutorial function[ ] merely because a prosecutor has chosen to participate." (alterations in original) (quoting *Simon*, 727 F.3d at 172)). The Fifth Circuit expressly distinguished the subpoenas in *Singleton* from those in *Cousin*, explaining that while the subpoenas at issue in *Singleton* were issued after charges had been filed in the criminal cases, *id.* at 783, they

16

were different than the conduct in *Cousin* because "the actions [in *Cousin*] occurred during a pending trial" and used to shape those actions at trial, while the use of false subpoenas in *Singleton* occurred "earlier in the process." *Singleton*, 956 F.3d at 783 n.5.[2]

    *Singleton* is on point here. Like in *Singleton*, Evans and his investigator Johnson spoke to Hallmon in an effort to gather information long before trial. Evans and Johnson spoke to Hallmon on May 7, 2001, Compl. ¶ 62, shortly after Mr. Flowers's conviction in *Flowers I* was overturned for prosecutorial misconduct by Mr. Evans, *id.* ¶ 37, and while his conviction in *Flowers II* was on appeal, *id.* ¶¶ 37-38. This was nearly three years before Mr. Flowers was convicted in *Flowers III*, *id.* ¶¶ 40-41, at a point when it was not known that the conviction in *Flowers II* would be reversed and that a third trial would be necessary. This is a far cry from *Cousin* where the prosecutor contacted counsel for the witness first, offering to make a deal, before then sitting down with the witness alone to coach him on his false testimony. *Cousin*, 325 F.3d at 635. Unlike *Cousin*, Evans and Johnson went directly to Hallmon, not his lawyer, asking him to "make it right," Compl. ¶ 56, in a "search[ ] for . . . clues and corroboration," *Buckley*, 509 U.S. at 273, to prop up their weak case against Mr. Flowers. Fabrication of evidence by a prosecutor during an ongoing investigation is purely investigatory conduct and is not entitled to absolute immunity. *See Wearry v. Perrilloux*, 391 F. Supp. 3d 620, 630 (M.D. La. 2019) (finding fabrication of evidence by prosecutor after suspect had been arrested and indicted was not entitled to absolute immunity); *see also Terwilliger*, 4 F.4th at 281 (distinguishing "[c]reating or manufacturing new facts" from

---

[2] The court distinguished the Supreme Court's decision in *Imbler v. Pachtman* on similar grounds. The conduct at issue in *Imbler*—asking law enforcement to hold off on questioning a witness until the witness completed his testimony—occurred **during trial** and the Supreme Court determined that "[s]een in its proper light," the request "was an effort to control the presentation of his witness' testimony, a task fairly within his function as an advocate." *Id.* at 783 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 n.32 (1976)). By contrast, in *Singleton*—like here—the conduct was aimed at seeking information out of court before trial. *Id.*

providing legal advice and finding prosecutor was not entitled to absolute immunity) (internal quotations omitted); *Moore v. Valder*, 65 F.3d 189, 194 (D.C. Cir. 1995) (noting that "[i]ntimidating and coercing witnesses into changing their testimony is not advocatory" and instead "is rather a misuse of investigative techniques").

Evans likewise points to *Beckett v. Ford*, 384 F. App'x. 435 (6th Cir. 2010) to suggest a prosecutor can threaten, coerce, or entice false statements from witnesses with impunity as long as it is "done as part of the effort to secure a conviction at trial." Evans Mem. at 17. This is flatly wrong. *Wooten*, 964 F.3d at 409 ("Prosecutors 'may not shield [their] investigative work with the aegis of absolute immunity merely because,' in hindsight, 'that work may be . . . described as 'preparation' for a possible trial.'" (internal quotations omitted)); *Wearry*, 391 F. Supp. 3d at 630; *Fields*, 740 F.3d at 1114 ("A prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial and arguing that the tort was not completed until a time at which he had acquired absolute immunity."). Evans coerced false testimony from Hallmon long before trial in *Flowers III*, and he cannot shroud that wrongdoing with immunity simply because he later introduced the falsified statements at trial.

Accordingly, Evans's role in creating false claims against Mr. Flowers is not covered by prosecutorial immunity.

## II. THE STATE-LAW CLAIMS ARE TIMELY, PROPER UNDER MISSISSIPPI LAW, AND ADEQUATELY PLED.

### A. The Abuse-Of-Process and False-Imprisonment Claims Are Timely.

On September 4, 2020, the state court granted the State's motion to dismiss the charges with prejudice against Mr. Flowers. Compl. ¶ 52. Less than a year later, on September 3, 2021, Mr. Flowers commenced this action. *See generally* Compl. Evans does not challenge the

18

timeliness of the malicious-prosecution claim,[3] but does contend that the abuse-of-process and false-imprisonment claims are untimely. Evans Mem. at 20-22. Contrary to his argument, the abuse-of-process claim was filed within the statute of limitations, and even if it was not, the limitations period should be equitably tolled. The false-imprisonment claim likewise should be equitably tolled.

The statute of limitations for abuse-of-process claims is three years. *Geico Cas. Co. v. Stapleton*, 315 So. 3d 464, 468 (Miss. 2021); Miss. Code Ann. § 15-1-49(1). The cause of action for this tort accrues "at the termination of the acts which constitute the abuse complained of." *Harried v. Forman Perry Watkins Krutz & Tardy Ronald King*, 813 F. Supp. 2d 835, 841 (S.D. Miss. 2011) (internal quotations omitted). This normally does not include "the completion of the action which the process issued." *Id.* (internal quotations omitted). But in *Geico*, the Mississippi Supreme Court held that an abuse-of-process claim based on the defendant's attempts at recovering on a defective default judgment could have accrued "the day the default judgment was set aside." 315 So. 3d at 469. The equivalent event here occurred on September 4, 2020, when the district court dismissed with prejudice the charges Evans had maintained against Mr. Flowers since 1997. *See* Compl. ¶ 52. The September 3, 2021 claim for abuse of process is accordingly timely.

The statute of limitations for false-imprisonment claims is one year. Miss. Code Ann. § 15-1-35. Such claims typically accrue on the date of arrest. *Parker v. Miss. Game & Fish Comm'n*, 555 So. 2d 725, 727 (Miss. 1989). That was in 1997 and therefore this claim was not filed within the limitations period.

---

[3] The statute of limitations for malicious prosecution is one year, Miss. Code Ann. § 15-1-35, and the cause of action "accrues on the day the criminal proceedings are terminated in the favor of the plaintiff," *Coleman v. Smith*, 841 So. 2d 192, 194 (Miss. Ct. App. 2003). The criminal proceedings against Mr. Flowers ended when the trial court granted the State's motion to dismiss the charges on September 4, 2020. His malicious-prosecution claim is therefore timely.

But the statutes of limitations for both the false-imprisonment claim and the abuse-of-process claim (in the event the Court concludes the latter was not filed within the limitations period) should be equitably tolled until the charges were dismissed. In Mississippi, a court can equitably toll a statute of limitations when a "technical forfeiture . . . would unjustly prevent a trial on the merits." 5 MS Prac. Encyclopedia MS Law § 44:22 (2d ed.). Equitable tolling is an option so long as the plaintiff did not "sleep on his rights." *Burch v. Ill. Cent. R.R. Co.*, 136 So. 3d 1063, 1066 (Miss. 2014) (internal quotations omitted); *accord. Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990); *Manning v. Epps*, 688 F.3d 177, 183-84 (5th Cir. 2012). It is permissible in "rare and exceptional circumstance[s]" and "turns on the facts and circumstances of a particular case." *Fisher v. Johnson*, 174 F.3d 710, 713, 714 (5th Cir. 1999) (internal quotations omitted). At bottom, equitable tolling provides a "discretionary" way to ensure to ease "harsh[ ]" applications of "the statute of limitations." *Id.* at 713.

Mr. Flowers's case is rare and exceptional. He is the only person in this country to have been tried six times for capital murder for the same crimes—crimes of which he is innocent. The limitations period for the false-imprisonment claim expired shortly after *Flowers I* resulted in a death sentence, while that sentence was on appeal, and while Evans was in the midst of bringing *Flowers II*. *See* Compl. ¶¶ 32, 35-36. And if Evans's position is correct, the abuse-of-process claim expired while *Flowers VI*—which resulted in a death sentence—was on appeal. *See id.* ¶ 44. Mr. Flowers was not in a position to bring a civil action against Evans during these windows because he was quite literally fighting for his life. He did not sleep on his rights; he fought the charges from the moment Evans brought them in 1997. Mr. Flowers was not free of Evans until the charges were dismissed in September 2020. Expecting Mr. Flowers to bring civil charges before that date is unduly harsh. Any civil suit he filed while his criminal case was ongoing would

have resulted in an administrative mess: His malicious-prosecution claim would have been barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), until September 2020, while his abuse-of-process and false-imprisonment claims would likely have been stayed until the same time, *see Wallace v. Kato*, 549 U.S. 384, 394 (2007). Tolling this claim therefore does not prejudice Evans. Tolling instead allows a man who was wrongfully convicted for 23 years to seek relief against the man who orchestrated that imprisonment. This Court should accordingly equitably toll the statutes of limitations until the charges were dismissed in September 2020.

### B. The Tort Claims Are Not Barred by the Mississippi Tort Claims Act.

While the MTCA normally "provides the exclusive civil remedy against a governmental entity and its employees for acts or omissions which gives rise to a suit," *Lang v. Bay St. Louis/Waveland Sch. Dist.*, 764 So. 2d 1234, 1236 (Miss. 1999), it does not apply to all such claims, *Univ. of Miss. Med. Ctr. v. Oliver*, 235 So. 3d 75, 81 (Miss. 2017). As Evans recognizes the MTCA does not apply to "torts in which malice is an essential element." *Id.* at 82 (citing Miss. Code Ann. § 11-46-5(2)); *see* Evans Mem. at 19. "Rather, 'any legal action against a governmental employee for these intentional torts must necessarily proceed against him or her as an individual.'" *Univ. of Miss. Med. Ctr.*, 235 So. 3d at 82 (quoting *Zumwalt v. Jones Cnty. Bd. of Supervisors*, 19 So. 3d 672, 688 (Miss. 2009)).

The state-law tort claims here are not barred by the MTCA. These claims are brought against Evans in his individual capacity. *See* Compl. ¶ 12. And all three intentional torts require a showing of malice. Evans agrees, *see* Evans Mem. at 23-34, that "[m]alice is an essential element of malicious prosecution." *Univ. of Miss. Med. Ctr.*, 235 So. 3d at 82. Evans also agrees that malice is required in abuse-of-process claims. Evans Mem. at 22. As he must: Abuse of process

"is the *malicious* perversion of a regularly issued civil or criminal process." *State for Use & Benefit of Foster v. Turner*, 319 So .2d 233, 236 (Miss. 1975) (emphasis added).[4]

And, as this Court has recognized, "false imprisonment . . . claims involve allegations of malice." *Minor v. Miss. Dep't of Pub. Safety*, No. 3:19CV155-NBB-RP, 2020 WL 1877798, at *3 (N.D. Miss. Apr. 15, 2020) (cited in Evans Mem. at 18); *Ducksworth v. Rook*, No. 2:14-CV-146-KS-MTP, 2015 WL 737574, at *6 (S.D. Miss. Feb. 20, 2015) (similar); *Ellis v. Lowndes Cnty.*, No. 1:16-CV-177-DMB-DAS, 2017 WL 6045440, at *6-7 (N.D. Miss. Dec. 6, 2017) (concluding that false-imprisonment claim could be pursued against officer because the complaint alleged that the officer "acted with malice in obtaining the arrest warrant").

Evans resists those cases, contending that because false imprisonment only requires showing "proof of the imprisonment and the falsity thereof," it does not require a showing of malice. Evans Mem. at 19-20 (citing *Parker*, 555 So. 2d at 728). But the tort also requires that the detention be willful, *Service Companies, Inc. v. Est. of Mautrice Vaughn*, 169 So. 3d 875, 879 (Miss. 2015), and be "done for the purpose of imposing a confinement," *State for Use of Powell v. Moore*, 174 So. 2d 352, 354 (Miss. 1965); *see also* 5 MS Prac. Encyclopedia MS Law § 41:26 (2d ed.) ("[I]ntent to confine is a required element of the tort as well as the elements of detention and unlawfulness."). So this Court was right to conclude that the tort "involve[s] allegations of malice." *Minor*, 2020 WL 1877798, at *3; *see Harmon v. Regions Bank*, 961 So. 2d 693, 699 (Miss. 2007) ("Malice in law . . . is the intent, without justification or excuse, to commit a wrongful act." (internal quotations omitted)).

---

[4] Evans offhandedly points to *Blake v. Wilson*, 962 So. 2d 705 (Miss. Ct. App. 2007), which applied the MTCA to an abuse-of-process claim. Evans Mem. at 22. But whether the defendants' alleged malicious torts removed them from the MTCA was not an issue in *Blake* because there was "no evidence, and no contention by the [plaintiffs], to indicate that any of the officers acted in a personal capacity." *Blake*, 962 So. 2d at 712.

Because all three state-law tort claims require a showing of malice, and because these claims are brought against Evans in his personal capacity, Evans may be held liable.

### C. The Tort Claims Are Adequately Pled.

The Complaint states plausible claims that Evans committed the torts of malicious prosecution, abuse of process, and false imprisonment. Evans contends that the malicious-prosecution and abuse-of-process claims were not sufficiently pled. Evans Mem. at 23-25. He does not make this argument with respect to false imprisonment. *See id.* at 19-21.

*1. Malicious Prosecution.* The Complaint adequately alleges that Evans committed each element of the tort of malicious prosecution, of which there are six:

> (1) the institution of a criminal proceeding; (2) by, or at the instance of, the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting the proceeding; (5) want of probable cause for the proceeding; and (6) the plaintiff's suffering of injury or damage as a result of the prosecution.

*Univ. of Miss. Med. Ctr.*, 235 So. 3d at 83 (internal quotations omitted). The Complaint alleges that Evans instituted six criminal proceedings against Mr. Flowers. *See* Compl. ¶¶ 1-3. It alleges that each proceeding's outcome was in Mr. Flowers's favor. *See id.* ¶¶ 37-38, 41-43, 49. And it alleges that Mr. Flowers "spent nearly half his life on death row at the Mississippi State Penitentiary at Parchman for crimes he did not commit," which "took an unimaginable toll on his mental and physical health." *Id.* ¶ 106. Evans does not challenge that these elements are satisfied.

The Complaint also alleges that the six criminal proceedings instituted by Evans against Mr. Flowers lacked probable cause. "Probable cause is determined from the facts apparent to the observer when the prosecution is initiated." *Benjamin v. Hooper Elec. Supply Co.*, 568 So. 2d 1182, 1190 (Miss. 1990). It requires both "(1) an honest belief in the guilt of the person accused and (2) reasonable grounds for such belief. One is as essential as the other." *Id.* This inquiry goes to "whether upon the appearances presented to the defendant, a reasonable person would have

instituted the proceeding." *Strong v. Nicholson*, 580 So. 2d 1288, 1294 (Miss. 1991) (quoting W. Prosser & W. Keeton, *The Law of Torts* § 119 (5th ed. 1984)).

Mr. Flowers's complaint is filled with well-pled allegations that Evans lacked an honest and reasonable belief in Mr. Flowers's guilt. "The crime scene demonstrated [that] the killer was someone with firearms proficiency, who was likely using a gun with which the killer was familiar." Compl. ¶ 25. By contrast, Curtis Flowers was a gospel singer with no criminal record and no history of firearms proficiency when he was arrested at the age of 26. Nothing in his background suggests that he would or could commit a brazen daylight robbery of a commercial establishment and kill four people with precision shooting. *Id.* ¶¶ 7, 32. There was also an abundance of evidence demonstrating that others were far more likely than Curtis Flowers to have committed this crime. *Id,* ¶¶ 25-32, 83-100.

There is more. The witnesses who allegedly saw Mr. Flowers that morning testified that he was in different places at the same time and wearing wildly different clothes. *Id.* ¶ 81. Evans's key witness in the final four trials admitted that his testimony was "a fantasy" and "[a] bunch of lies" made at the urging of Evans and in exchange for favorable treatment from him. *Id.* ¶ 59. Finally, "[n]o plausible motive tied Mr. Flowers to the crimes." *Id.* ¶ 29. The prosecution's theory is absurd: that Flowers, a gospel singer with no criminal record, committed quadruple homicide "because he was upset over having been let go from a minimum wage job" he had held "for a total of three and a half days." *Id.* ¶ 29. There is nothing reasonable or honest about Evans's belief in Mr. Flowers's guilt.

The Complaint also alleges that Evans instituted each proceeding out of malice, that is, that he acted "primarily for a purpose other than that of bringing an offender to justice." *Univ. of Miss. Med. Ctr.*, 235 So. 3d at 83 (internal quotations omitted). Malice can be established by

24

circumstantial evidence, which includes the "absence of probable cause." *Benjamin*, 568 So. 2d at 1191. It can also be inferred "from the facts of the case," including evidence that the "defendant acted in reckless disregard of the other person's rights." *Id.*

Evans's malicious intent in prosecuting Mr. Flowers is apparent from the Complaint. The Complaint specifically alleges an ulterior motive: "Defendants"—including Evans—"pursued and prosecuted Mr. Flowers to quell pressure to make an arrest for the Tardy Furniture murders and protect their jobs and reputations." Compl. ¶ 105. The facts as alleged support this statement. Mr. Flowers was questioned on the afternoon of the murders but was not arrested until six months later, after pressure to make an arrest had built and the Defendants had cooked up a story. *Id.* ¶¶ 23-24, 29, 32. The clear lack of probable cause also indicates that Evans acted maliciously in prosecuting Mr. Flowers six times. Finally, trying Mr. Flowers for murder six times based on a harebrained theory and manufactured evidence is, at the minimum, in "reckless disregard" of Mr. Flowers's rights. *Benjamin*, 568 So. 2d at 1191.

Evans disagrees, arguing that he had probable cause for trying Mr. Flowers six times and lacked malice when he did so. As for the existence of probable cause, Evans touts that Mr. Flowers was convicted in four separate trials. Evans Mem. at 24. But a conviction based on "fraud, perjury, or other corrupt practices" does not establish a prima facie case of probable cause. *Royal Oil Co. v. Wells*, 500 So. 2d 439, 443 (Miss. 1986). The four convictions were all reversed by the Mississippi Supreme Court or the U.S. Supreme Court for Evans's prosecutorial misconduct. Compl. ¶¶ 37-38, 41-43, 49. All six trials relied on false testimony. *See, e.g.*, *id.* ¶¶ 55-60, 67, 69, 73-74. Indeed, the key witness in the final four trials later admitted that his testimony was "[a] bunch of lies" made in exchange for favors from Evans. *Id.* ¶ 59. Those convictions are rotten. They should not be relied upon to find probable cause.

Even if all that could somehow be ignored, this "prima facie case, of course, is subject to rebuttal by plaintiff's evidence." *Royal Oil Co.*, 500 So. 2d at 443. As previously explained, the evidence indicating that there was no probable cause is significant. *See supra* at 24-25. The Court need not take Mr. Flowers's word on this. The trial court recognized that the State's case is "weak[ ]." Compl. ¶ 50. The State did, too: When it moved to dismiss the charges, the State conceded that "there is no key prosecution witness that incriminates Mr. Flowers who is alive and available and has not had multiple, conflicting statements in the record" and that "the Court was made aware of alternative suspects with violent criminal histories, as well as possible exculpatory evidence not previously considered." *Id.* ¶ 52.

As for the lack of malice, Evans does not even try to argue that he had a pure motive in prosecuting Mr. Flower six times. He instead says that Mr. Flowers "has asserted no such alternative purpose that District Attorney Evans might have had for prosecuting [Mr. Flowers] other than the pursuit of justice." Evans Mem. at 24. That is false. The Complaint explicitly alleges that Evans "pursued and prosecuted Mr. Flowers to quell pressure to make an arrest . . . and protect [his] job[ ] and reputation[ ]." Compl. ¶ 105. It also alleges, in detail, Evans's lack of probable cause and his reckless disregard for Mr. Flowers's rights—key indicators that Evans acted with malice.

*2. Abuse of Process.* Mr. Flowers has likewise adequately pled that Evans committed the tort of abuse of process. The element of that tort are:

> (1) that the defendant made an illegal and improper perverted use of the process, a use neither warranted nor authorized by the process; (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of process; and (3) that damage resulted to the plaintiff from the irregularity.

*Turner*, 319 So. 2d at 236. "[T]he crucial element of this tort is the intent to abuse the privileges of the legal system." *Ayles ex rel. Allen v. Allen*, 907 So. 2d 300, 303 (Miss. 2005). The Complaint

details Evans's illegal and improper use of the judicial process—from suborning Hallmon's false testimony, Compl. ¶¶ 55-62, to knowingly introducing false testimony of Mr. Flowers's whereabouts on the day of the murders, *id.* ¶ 67, to failing to disclose potentially exculpatory evidence, *id.* ¶ 89. It details the damage done to Mr. Flowers. *Id.* ¶ 106-110. And, for the same reasons discussed above, *supra* at 26, the Complaint adequately alleges that Evans had an ulterior purpose in abusing the judicial process.

Evans does not contest that Mr. Flowers adequately alleges that Evans illegally used the judicial system and that this damaged Mr. Flowers. He instead argues again that Mr. Flowers "has not alleged that District Attorney Evans had any ulterior motive or purpose in pursuing his prosecution." Evans Mem. at 23. That is wrong, again. The Complaint says that Evans prosecuted Mr. Flowers to protect his job and reputation. Compl. ¶ 105. That is an ulterior motive.

Evans also cautions this Court not to infer an ulterior motive "from a failure to follow proper procedure," pointing to *Williamson ex rel. Williamson v. Keith*, 786 So. 2d 390 (Miss. 2001) for support. Evans Mem. at 23. *Williamson* is nothing like this case. The alleged abuse of process there was a school district's attorney's failure to send the opposing attorney a copy of a subpoena in preparation for an administrative due-process hearing. *Williamson ex rel. Williamson*, 786 So. 2d at 392-93. The attorney acknowledged that that failure to "follow proper procedure" was a mistake. *Id.* at 394-95. This case, on the other hand, involves a district attorney who knowingly suborned perjury, presented false testimony, and failed to disclose exculpatory evidence. In six trials. That is not a mistake or a mere "failure to follow proper procedure." That is a willful perversion of the judicial process.

*3. False Imprisonment*. Evans does not contest that the Complaint adequately pleads a false-imprisonment claim. *See generally* Evans Mem. at 19-21. He instead retreats again to the

MTCA, arguing that the failure to provide notice of this claim to the State strips this Court of jurisdiction. Evans Mem. at 20. But notice is not required for malicious-tort claims brought against defendants in their individual capacity because those claims are not governed by the MTCA. *See Zumwalt*, 19 So. 3d at 688; *see also Springer v. Ausbern Constr. Co.*, 231 So. 3d 980, 989 (Miss. 2017). The false-imprisonment claim—which requires a showing of malice and is brought against Evans in his individual capacity, *see supra* at 23—is therefore not barred by that statute's notice requirement.

### D. The Mississippi Constitutional Claims Are Proper Under Mississippi Law.

The Complaint alleges that Evans violated Article 3, Sections 14, 23, and 26 of the Mississippi Constitution. Compl. ¶ 112. Evans does not contest that these claims are adequately pled. He instead argues that they are barred by two Mississippi statutes: the MTCA and Mississippi's wrongful-conviction state. Evans Mem. at 18-19. Evans is wrong.

The MTCA does not bar the constitutional claims for the same reason it does not bar the state-law tort claims: Because Evans was acting with malice when he violated Mr. Flowers's constitutional rights by falsely imprisoning him, maliciously prosecuting him, and abusing the judicial process, Evans was not acting as an employee of the State under the MTCA. *See* Miss. Code. Ann. § 11-46-5(2); *Green v. City of Moss Point*, 495 F. App'x 495, 500 (5th Cir. 2012) ("A governmental employee who commits a tort with malicious intent . . . may be held personally liable for that act."); *see also supra* at 22-24. That is why he is being sued in his individual capacity. *Univ. of Miss. Med. Ctr.*, 235 So. 3d at 82. The MTCA does not apply.

*City of Jackson v. Sutton*, 797 So. 2d 977 (Miss. 2001), and *Minor* (relied upon by Evans) do not change that conclusion. *See* Evans Mem. at 18. *Sutton* concerned a claim that "the City of Jackson, through the actions of" a police officer violated the plaintiff's constitutional rights. 797 So. 2d at 979. *Minor* similarly concerned a claim for municipal liability against a Mississippi

town. 2020 WL 1877798, at *1. Both cases were plainly "against a governmental entity or its employee," and thus had to be channeled through the MTCA. Miss. Code Ann. § 11-46-7(1). But this case is against Evans in his *individual* capacity. The MTCA therefore does not bar these claims. Moreover, *Sutton* relied upon Miss. Code § 11-46-7(1), which states in part: "any claim made or suit filed against a governmental entity or its employee to recover damages for any injury *for which immunity has been waived* under this chapter shall be brought *only under the provisions of this chapter*, notwithstanding the provisions of any other law to the contrary." 797 So. 2d at 980 (quoting Miss. Code § 11-46-7(1)) (emphasis added). But § 11-46-5(2) states that "a governmental entity *shall not . . . be considered to have waived immunity* for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense other than traffic violations." (Emphasis added). Thus, the exclusivity provision of § 11-46-7(1), upon which *Sutton* relied, clearly does not apply to claims of malice like those in this case.

Mississippi's wrongful-conviction statute does not bar this action either. That statute allows a wrongfully convicted person to pursue a claim against the State of Mississippi. *See* Miss. Code Ann. § 11-44-5. And it bars "[a]ny claimant who obtains a reward" under the statute from "obtain[ing] an award by reason of the same subject against the State of Mississippi or a political subdivision thereof . . . under the provisions of the Mississippi Tort Claims Act." *Id.* § 11-44-7(4). But this case is not seeking an "award" from the State of Mississippi or a political subdivision under the Mississippi Tort Claims Act. This case is against Evans in his individual capacity. The wrongful-conviction statute is accordingly no obstacle to Mr. Flowers's constitutional claims.

*        *        *

29

The state-law tort claims are timely; they are not barred by the MTCA; and they are adequately pled. The state constitutional claims are likewise adequately pled and not barred by any Mississippi law. This Court should accordingly deny Evans's Motion to Dismiss these claims.

## CONCLUSION

For the forgoing reasons, Doug Evans's Motion to Dismiss should be denied.

Respectfully submitted,

November 23, 2021

/s/ Robert B. McDuff
Robert B. McDuff
MISSISSIPPI CENTER FOR JUSTICE
767 North Congress Street
Jackson, MS 39202
rbm@mcdufflaw.com
(601) 259-8484

Jonathan L. Abram (admitted *pro hac vice*)
Kathryn Marshall Ali (admitted *pro hac vice*)
W. David Maxwell (admitted *pro hac vice*)
Kaitlyn Golden (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
kaitlyn.golden@hoganlovells.com
(202) 637-5600

*Counsel for Plaintiff Curtis Giovanni Flowers*

**CERTIFICATE OF SERVICE**

I, Robert B. McDuff, attorney for Plaintiff Curtis Giovanni Flowers, do hereby certify that on this 23rd day of November 2021, I caused a true and correct copy of the above and foregoing to be filed with the Court's ECF system, which sent notification of such filing to all counsel of record.

November 23, 2021                                        /s/ Robert B. McDuff
                                                        Robert B. McDuff

                                                        *Counsel for Plaintiff Curtis Giovanni Flowers*