**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**CURTIS GIOVANNI FLOWERS**                                           **PLAINTIFF**

**v.**                                              **CIVIL ACTION NO. 4:21-CV-110-MPM-JMV**

**DOUG EVANS, in his individual capacity,
JOHN JOHNSON, in his individual capacity,
WAYNE MILLER, in his individual capacity,
and JACK MATTHEWS, in his individual capacity**                    **DEFENDANTS**

### JOHN JOHNSON'S MEMORANDUM OF AUTHORITIES IN SUPPORT OF MOTION FOR ABSOLUTE OR QUALIFIED IMMUNITY

**COMES NOW, DEFENDANT**, John Johnson, in his individual capacity, by and through

Counsel, and respectfully submits these supporting authorities which warrant a finding of immunity

for this Defendant and in support thereof would show this Court the following, to-wit:

### I. INTRODUCTION

This case arises out of the multiple convictions of Curtis Giovanni Flowers for the July 16,

1996, quadruple murders at Tardy's Furniture Store. [Doc. 1], p. 5.

In the Summer of 1996, Tardy's Furniture was a well-established downtown Winona

business owned and managed by Mrs. Bertha Tardy.

On the morning of July 16, 2022, at approximately 10:00 a.m., 59 year-old Mrs. Tardy, along

with other store employees: 16 year-old Derrick "Bobo" Stewart, 42 year-old Robert Golden and 49

year-old Carmen Rigby were all fatally shot while the four prepared to open the store for business.

The gunman shot all four victims at close range. (Affidavit of John Johnson attached as

Exhibit "A"). All of the murders occurred in the center of the store near the Tardy's main counter.

(Johnson Affidavit Exhibit "A"). All four victims were found lying just a few feet from each other.

1

(Exhibit "A").

The District Attorney for the Fifth Circuit, where the murders took place, was Defendant Doug Evans.

The Complaint alleges that "Evans was deeply involved in the investigation of the case" and "Evans and his office coordinated the investigation" and that "all information about the investigation was funneled through the D.A.'s office." [Doc. 1], pp. 5-6. According to Flowers, Evans maintained "centralized control of the entire investigation." [Doc. 1], p. 6.

The Complaint alleges John Johnson was the "lead investigator" of the Tardy's Furniture murders and was employed by Evans through the District Attorney's Office.

Flowers claims there was "no plausible motive" to tie him to the crime. [Doc. 1], p. 7. However, Flowers was a former employee of Tardy's Furniture who was fired just a week before the July 16, 1996, murders. [Doc. 1], p. 8. Flowers called Mrs. Tardy following the July 4, 1996, holiday (on Monday, July 8th) to see if he still had a job, and Mrs. Tardy told him there was no job. [Doc. 1], p. 8. Flowers made this call after not showing up for work three days in a row and having his check docked for dropping batteries that belonged to Mrs. Tardy. *Id.*

According to the Complaint, Doc. 1, the Defendants caused the Plaintiff to be wrongfully incarcerated for twenty-three years through their purported misconduct during the investigation and prosecution of the Plaintiff. As a result, the Plaintiff maintains that the Defendants violated his rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article 3, Sections 14, 23, and 26 of the Mississippi Constitution. The Plaintiff also asserts state law tort claims for malicious prosecution, abuse of process, and false imprisonment. The Plaintiff asks this Court for an award of compensatory and punitive damages, attorneys' fees, and costs.

Flowers was arrested for the murders on January 13, 1997.

Flowers alleges the investigators in this case, including Johnson, and the District Attorney had no evidence linking him to the crimes and violated his constitutional rights by taking him to trial for murders Flowers says he did not commit.

However, the evidence against Flowers was substantial: multiple witnesses saw Flowers heading to and from the store on the morning of the murders with a witness actually seeing Flowers running from the store in the moments following the killings; Flowers was directly tied to the gun used in the crimes; Flowers was known to wear the exact shoe worn by the murderer; gunshot residue was found on Flowers' hand after the murders; Flowers had the motive to kill as he had just been fired from the furniture store and he had the opportunity - Flowers had no real alibi. Moreover, even though the store was "closed" when the murders occurred, no one would have thought twice about Flowers walking into the store on the morning of July 16, 1996, because each person shot knew Curtis Flowers, as he was a former employee.

Individual Defendant John Johnson brings this immunity Motion as he is either entitled to (1) absolute immunity due to all of his alleged activities being covered by prosecutorial immunity or (2) qualified immunity for all acts complained of.

Johnson served as the District Attorney Doug Evans' investigator. For all of the allegations made, Johnson must be cloaked in the same prosecutorial immunity afforded D.A. Evans.

For any and all allegations, to the extent Johnson was involved personally, all actions were taken as a part of the prosecution's preparation for trial. Alternatively, Johnson is also entitled to qualified immunity for all of his actions as he acted with good faith and within the scope of his discretionary authority at every step of the investigation, and the Plaintiff can point to no clearly

3

established law which Johnson knowingly violated. For all of these reasons, dismissal is proper.

**Facts**

After a 6-month investigation lead by the Mississippi Highway Patrol, and assisted by the Winona Police Department and by the District Attorney's Office, Curtis Flowers was arrested January 13, 1997, for the quadruple Tardy's Furniture store killings. (Johnson Affidavit Exhibit "A"). The decision to arrest Flowers was made after gathering multiple pieces of evidence all pointing toward Flowers' guilt and establishing probable cause as to that guilt. (Exhibit "A").

Ultimately, Mississippi Highway Patrol officer Wayne Miller was named as the Case Officer over the murder investigation. Jack Matthews was subsequently named Case Officer after Wayne Miller retired. (Exhibit "A").

Investigator Johnson understood the "Case Officer" to be the lead investigator and the person deemed to be in charge of the investigation. (Exhibit "A"). The MHP had control and custody over every piece of evidence in this case. (Exhibit "A").

The Tardy murders occurred sometime just before 10:00 a.m. on the morning of July 16, 1996. All four victims, one owner and three employees of Tardy's Furniture, were shot at close range. (Exhibit "A").

Curtis Flowers was a former employee of Tardy's, with his short career ending after he was fired just days before the murders and after the store was burglarized in the night. (Exhibit "A").

 The evidence gathered establishing probable cause that Flowers committed these murders was as follows (all as set forth in Johnson's Affidavit attached as Exhibit "A")

•      Just prior to the murders, Flowers was hired by Bertha Tardy, the owner of Tardy Furniture and was subsequently fired by Mrs. Tardy. Flowers was fired because he missed multiple days of

work without calling in. During his short career at Tardy, Flowers dropped very expensive batteries and Mrs. Tardy informed him she would have to deduct the cost of the batteries from his check;

• Curtis was seen by a witness leaning on Mr. Doyle's (Curtis's relative) car the morning of the murders between 7:00-7:30 a.m.; it was ultimately discovered that Doyle's gun was the gun used in the murders and Doyle's gun was in his car on the morning of the murders and was discovered (after the murders) to be missing;

• Three witnesses: Edward Lee McChristian, Benard Seals, and Clarence Benard Forrest, were sitting together on a porch and all saw Curtis walking from the direction of Doyle's car back toward Flowers's home;

• A witness saw Curtis on Harper Street between 9:00-9:30 a.m., en route to Tardy's Furniture;

• Two witnesses, Beneva Henry and Vera Latham, both saw Curtis at 504 Campbell after 9:10 a.m., en route to Tardy's Furniture;

• A witness saw Curtis running away from the direction of Tardy's about 10:00 a.m. just after the murders occurred - running like "somebody was after him";

• This same witness then saw him cross Hwy 51 toward Jeff's Store and Curtis admits in an interview that he was at Jeff's Store the day of the murders;

• Several people (at least 17) have seen Curtis wear white Fila shoes several times prior to the day of the murders, Fila shoe prints were discovered at the murder scene and were identified as the shoe the murderer would have been wearing - the shoe prints were Curtis's shoe size;

• Witness Mary Sue Moore says that Connie Moore (Curtis's girlfriend) told her minor son (Lamarcus Moore) to lie to police that Curtis was home all morning, but Curtis was not home. He told them he was going to Piggly Wiggly for groceries but did not come back with any groceries;

5

•       Witness Betty Ware says that Connie (Curtis's girlfriend) told her that Mrs. Tardy had been ugly to Curtis;

•       Crime Lab results were positive for gunshot residue on the back of Curtis's right hand - Curtis is right-handed;

•       Crime Lab results were a positive match for a projectile fired from Doyle's (Curtis's relative) gun to the projectile found in the mattress next to Mrs. Tardy and several other projectiles located at the scene;

•       Doyle (Curtis's relative) asked a witness to lie to the jury about his gun;

•       Money with blood on it was found inside Flowers' residence;

•       Clothes were found in Flowers' washing machine with blood on them;

•       When Flowers was a juvenile, he shot another young man in the chest at close range and told the young man "I'm gonna shoot you" right before he pulled the trigger. Flowers used a weapon similar to the one used in the Tardy's murders. Flowers told the young man to lie about the shooting. John Johnson worked this case and believed Curtis lied about this shooting and Johnson also believed as an investigator that this shooting was no accident;

•       It takes 6-10 minutes with a brisk walk/jog/run to get from Tardy's furniture store to Flowers' house because of the shortcuts taken through yards and pass-throughs across dry ditches, a hole in a fence behind a witness's house, a cemetery, empty lots, and areas of overgrown brush;

•       Tardy's Furniture was burglarized in the days before the murder and the burglar left the building by way of the side exit. Only Tardy employees knew where the key to the padlock on the exit door was located at - in its hiding spot. After the burglar retrieved the key, he unlocked the padlock, replaced the key to its original hiding place, and exited the building;

6

•     Flowers failed his polygraph test on 7/18 when he was asked questions about the burglary and the murders;

•     There was money ($387.00) missing from the cash register. Money ($235.00) was found at Flowers' house by his bed with blood on all of it;

•     A Montgomery County Sheriff's Deputy (Jerry Butler) recovered a Fila tennis shoe box from Flowers's girlfriend's house - Flowers' girlfriend stated the shoe box was her son's shoe box, but the size of the shoe was Curtis Flowers' shoe size;

The following time line was established by the investigation:

**July 16, 2016**

6:30-7:30 a.m.         Curtis was seen sitting on his porch by witness (Elaine Gholston)

7:15 a.m.              Curtis was seen by witness (Patricia Hollman) wearing Fila tennis shoes that morning before the murders occurred. She stated he has another pair that were Fila but not Grant Hill, and she saw him wear those once after the murders. She also heard Connie (Curtis's girlfriend) say that "I know they are not going to find the gun. I just know they won't."

**Going to Get the Gun the Morning of the Murders - July 16, 1996:**

7:15-7:20 a.m.         Witness (James Kennedy) saw Curtis that morning walking from Hwy 51 on Angelica Drive toward Angelica Dr., this is where Mr. Doyle worked. Doyle was at work that morning, his car parked outside. Inside his car was a gun which went missing that morning and was ultimately established as the Tardy multiple murders weapon;

7:00-7:30 a.m.         Flowers was seen leaning on Doyle's car (witness Katherine Snow);

7:40-7:45 a.m.         Flowers was seen by three witnesses (Edward McChristian, Benard Seals, Clarence Benard Forrest) walking from the direction of 407 going north; this would be headed away

7

from Angelica and toward Flowers' home;

**Going to Tardy's:**

9:00 a.m.          Victim Bobo Stewart, a Tardy employee, was dropped off at Tardy's at 9:00 a.m.;

9:00 a.m.          Victim Carmen Rigby, another Tardy's employee, was at post office at +/- 9:00 a.m.;

9:10-20 a.m.          Sometime after 9:10 a.m. Curtis was seen by two witnesses (Vera Latham and Beneva Henry) on Campbell Street which is near the Tardy's store. She spoke to him and told him if he was on his way to work at the furniture store, he was going to be late;

9:15-9:20          Sometime between  a witness (Porky Collins) saw Curtis walking toward Tardy's;

9:10-20 a.m.          Sometime after 8:50 a.m. Flowers talked to witness (Mary Fleming) as he was walking toward town and Tardy's Furniture. They walked by each other on Campbell Street;

9:25 a.m.          Carmen made Tardy's bank deposit +/- 9:25 a.m. (2nd car in line behind Chancery Clerk). At this time, Mrs. Tardy, Bobo, and Robert were all in the store, and Carmen entered last;

9:30 a.m.          Mrs. Tardy called witness Sam Jones at +/- 9:30 a.m. to ask if he could come to the store. Jones left his house at 9:30 and stopped to talk to some friends. Jones says he entered the store +/- 10:05 and heard someone struggling for breath (Bobo) and approached the bullpen area. He saw Bobo first, then Robert, then Carmen, and then Mrs. Tardy;

10:00 a.m.          Witness Porky Collins saw Curtis standing outside the front of Tardy's Furniture.

8

**After the Murders:**

10:00 a.m.                 Just after 10:00 a.m. witness Clemmie Flemming saw Curtis Flowers running "like someone was after him" running from the rear of Tardy's Furniture store and minutes later was seen crossing Highway 51 toward Jeff's Store down by Carrollton Avenue by Church Street and running toward Campbell Street.

10:10 a.m.                 Witness (John Seals) saw Curtis walking west on Powell Street at Hwy 51 - this puts Curtis blocks from Tardys' headed to his home.

10:21 a.m.                 911 call received at 10:21 a.m.

12:00 noon                 Witness saw Curtis wearing shorts, no shirt, and a towel around his neck

**Flowers' History at Tardy's**

•        Worked on (Sat.) 6/29/96 (first day of work)

•        Worked on (Mon.) 7/1, (Tues.) 7/2, and (Wed.) 7/3 until noon and was off for (Thurs.) 7/4 holiday

•        Was supposed to work (Fri.) 7/5, (Sat.) 7/6, & (Mon.) 7/8 but did not show up for work

•        On 7/3 Curtis dropped the batteries out of the back of the truck & laughed about it & after he told Mrs. Tardy, she loaned him $30 for the holiday weekend

•        Burglary happened the weekend of 7/6 - 7/7

•        On (Tues.) 7/9 Mrs. Tardy told Curtis they did not have a job for him

•        Murders on (Tues.) 7/16

Flowers was ultimately tried 6 times for the crimes. Flowers was convicted in 4 of those 6 trials with the remaining two trials resulting in a hung jury. *Id*. Each of the 4 convictions were reversed on appeal due to prosecutorial actions of Doug Evans. *Id*. There is no allegation that any

9

action of Johnson resulted in a reversal of any one of Flowers' convictions. See Complaint generally [Doc. 1].

In his Complaint, Flowers alleges "much of the Misconduct" was engaged in by Evans, but Flowers alleges generally the "misconduct" engaged in by Defendants as follows:

**1.    Confession**

***Odell Hallmon***

Flowers alleges Career criminal Odell Hallmon was "persuaded" by Evans and Johnson to "fabricate testimony" and state in trials three through six that "Mr. Flowers confessed to him." Flowers claims at "Evans prompting" Hallmon claimed he was not testifying in exchange for benefits when, in fact, Hallmon has "since admitted that his statements were manufactured in exchange for leniency from Evans." [Doc. 1], p. 14. Flowers alleges Hallmon made these claims in the "*In the Dark*" podcast and that Evans did "extraordinary favors" for him in order for Hallmon to implicate Flowers.

All of Hallmon's interactions with Evans, and as alleged, Defendant Johnson, **occurred after Flowers had been twice convicted.**

**2.    Route Witnesses**

Flowers next claims "Defendants" pressured witnesses to "testify in line with the investigator's plan to pin this on Curtis Flowers." [Doc. 1], P. 16.

However, of the witnesses Flowers listed as problematic for Defendants, four witnesses have always held true to their statements which put Flowers on the route to the murders and in the parking lot where the murder weapon was stolen from Doyle Simpson's vehicle. These are witnesses Kennedy, Snow, Mary Jeanette Fleming, and Beneva Henry. The remaining witnesses cited by

Flowers - Clemmie Fleming and Ed McChristian - now claim they saw Flowers on the route to the murder scene, but cannot recall the specific day. However, Clemmie Fleming was interviewed after Flowers was arrested, and McChristian's claim is that he said he saw Flowers en route to the murder scene because someone had already said McChristian had seen Flowers.

The "In the Dark" podcast cited by Flowers in the Complaint acknowledges multiple witnesses reported seeing Flowers coming and going from the murder scene on the morning of the incident. Among those witnesses was Clemmie Fleming, who offered the most incriminating "route witness" testimony:

> A number of people testified to seeing Flowers walking around Winona on the morning of the murders. But, of all these so-called "route witnesses," Fleming offered the most incriminating testimony. She's long been the only living person to put Flowers on the same side of town as Tardy Furniture, and she's the only witness to describe him doing something out of the ordinary — running — on the morning of the murders. She's also known Flowers her whole life. The two grew up in the same neighborhood and are around the same age. She would have had no trouble recognizing him, whether he was walking or in a full sprint.

**Clemmie Fleming**

Plaintiff Flowers claims witness Clemmie Fleming spoke to Defendant D.A. Investigator John Johnson **nine (9) months after the murders took place**, or approximately February 16, 1996. [Doc. 1], p. 16. This would place the interview a month following Flowers arrest on January 13, 1997.

Fleming now claims she "had seen Mr. Flowers near Tardy Furniture but did not remember which day it was." *Id.* However, "In the Dark" also acknowledges Fleming's testimony remained the same throughout all of Flowers' trials:

> And her story has been relatively consistent across six trials. She's said that she was driven to Tardy Furniture on the morning of the murders by a man named Roy Harris.

11

She had an overdue furniture bill, which Bertha Tardy had been asking her to pay. But, Fleming has testified, she wasn't feeling well when she and Harris pulled up to the store — she was five months pregnant at the time — and they drove away without going in. As they left, she's said she saw Flowers roughly 92 feet west of the store, running away from it, in the direction of his home. She's said she was sure of the date: July 16, 1996.

**TRIAL 1**

Clemmie Fleming: Well, I was coming down to Tardy's to go pay on my furniture, and I didn't, and I kept on going.

**TRIAL 2**

Doug Evans: Why did you not go in Tardy Furniture?

Fleming: I didn't feel like it.

Evans: Okay, would you explain your condition at that time to the ladies and gentlemen of the jury so they will know why you didn't feel like it?

Fleming: I was pregnant.

**TRIAL 3**

Evans: Which direction did you go from Tardy Furniture?

Fleming: On the side of Tardy's like -- what is the name of that street on the side? On the side of Tardy's?

Evans: Is it Carrollton?

Fleming: Carrollton Avenue.

**TRIAL 4**

Evans: Did you see anything as you pulled on to the road beside Tardy Furniture?

Fleming: Yes, sir.

Evans: What did you see?

Fleming: Curtis.

Evans: Curtis who?

Fleming: Flowers.

Evans: Where was Curtis Flowers when you pulled beside Tardy Furniture around 10:00 that morning?

Fleming: Running on the side of it.

**TRIAL 5**

Evans: Would that be toward or away way from Tardy Furniture?

Fleming: Away.

Evans: He was running away from the direction of Tardy Furniture.

Fleming: Yes, sir.

Evans: How was he running?

Fleming: Running real fast.

Evans: Would you consider it a jog or an all-out run?

Fleming: An all-out run.

**TRIAL 6**

Evans: Any doubt about who you saw running from the back of Tardy Furniture on the morning of the murders?

Fleming: No, sir.

> *"In the Dark"* at https:/features.apmreports.org - Season Two.

> *"In the Dark"* reported Fleming said that she got drawn into the case because, at some point

after Flowers became a suspect, she'd mentioned to some people — at least a co-worker and a cousin — that she'd once seen him running near Tardy Furniture.  *Id*.  One or more of those people apparently reported Fleming's story to law enforcement.  *Id.*  Then, she says, law enforcement officers came to talk with her.  *Id.*

She says one of the investigators — she doesn't clearly remember his name — threatened her with prosecution if she withheld evidence.  *Id.*  Fleming now claims, after testifying in 6 trials to the contrary that: "I always did try to tell them I don't remember what day," Fleming said. "I tried to tell him, but he wouldn't listen. He wasn't hearing that."  *Id.* Asked what the investigator seemed to be hearing, Fleming said, "What he wanted to hear."  *Id.*

### Ed McChristian

Route witness Ed McChristian now also claim he was unsure of the day he saw Flowers walking toward the Tardy's Furniture store, even though he testified again and again he was certain he saw Flowers.  However, according to the Complaint:

"Somebody had told [the investigators] I seen him, so I couldn't say I didn't see him." (Complaint, [Doc. 1] at p. 18, ¶73).  McChristian explained "So all I had to do was go there, and they asked me a question and I answered it." *Id*.

"In the Dark" reports:

Ed McChristian gave a statement to law enforcement on August 15, 1996 — nearly a month after the murders. McChristian also testified at trial. McChristian told APM Reports that he recalled seeing Flowers walk by his house at some point that summer but had never remembered the exact date. McChristian said that when John Johnson, the D.A.'s investigator, questioned him, Johnson said that he already knew the date that McChristian saw Flowers — and that it was July 16, 1996 — the day of the murders. Johnson said someone had told him that McChristian had seen Flowers but wouldn't disclose who. McChristian told APM Reports that he wouldn't have been able to name an exact date without Johnson supplying one. "I wasn't even really

sure," McChristian said. "They had more about it than I did." McChristian told APM Reports that he didn't want to testify at Flowers' trials, but he worried that he might get fined or even put in jail if he refused.

*"In the Dark"* at https:/features.apmreports.org - Season Two.

McChristian was one of three men interviewed by Johnson in the weeks following the murder. The two other men both gave the same account as McChristian - that they saw Flowers walk by McChristian's house on the morning of the murders. (See Statements Exhibit "B" McChristian's statement, Exhibit "C" Seals' statement, and Exhibit "D" Forrest's statement).

**Catherine Snow**

Regarding Snow, Flowers apparently contends her account is contradicted by a co-worker, but there is no question Catherine Snow gave several statements to law enforcement where she confirmed that she saw a man that morning in a parking lot in Winona — the same parking lot where Doyle Simpson claimed his gun had been stolen."In the Dark" reports, "Weeks later, investigators showed Snow a photo lineup to see if she could identify the man. According to law enforcement records, Snow selected a photo of Flowers. Snow declined to talk with APM Reports about her testimony." *"In the Dark"* at https://features.apmreports.org - Season Two.

**Snow has never recanted her testimony.**

**James Edward "Bojack" Kennedy**

Flowers appears to also attempt to discredit witness Kennedy's testimony. James "Bojack" Kennedy gave a statement to law enforcement on September 17, 1996 — about two months after the murders. Kennedy also testified in five trials. He told APM Reports that his testimony about seeing Flowers walk by his house was true. *"In the Dark"* at https://features.apmreports.org - Season Two.

**Kennedy has never recanted his testimony.**

15

**Beneva Henry**

Finally, Flowers seems to attempt to discredit Beneva Henry's testimony because she gave a statement to law enforcement on September 3, 1996, six weeks after the murders. In the statement, Henry says she saw Flowers on the morning of the murders. Henry also testified at trial. She died in 2011. *"In the Dark"* at https:/features.apmreports.org - Season Two.

**Henry has never recanted her testimony.**

**Mary Jeanette Fleming**

Flowers also tries to discredit the testimony of Mary Jeanette Fleming who gave a statement to law enforcement on February 13, 1997. Flowers states this statement was given nearly seven months after the murders and were instigated by police. Fleming testified she saw Flowers on the route to Tardy Furniture on the morning of the murders. *"In the Dark"* at https:/features.apmreports.org - Season Two.

**Mary Jeanette Fleming her never recanted her testimony.**

**3.     Failure to Investigate**

Plaintiff Flowers also makes general accusations that there was a failure to fully investigate supposed other suspects. Namely, Flowers claims the following suspects were not "thoroughly investigated" and were "much more likely" to have committed the murders: "the Alabama Suspects" (three men from Alabama Flowers claims had a similar modus operandi to the Tardy murders), Willie James Hemphill (lived near the furniture store and had a criminal history) and Doyle Simpson, the man who reported his gun missing on the day of the murders. (See Complaint, [Doc. 1] at Page ID# 22-23. Flowers claims Simpson was not thoroughly investigated as a suspect or his twin brothers, Walter and Wallace. *Id*. at p. 24.

16

### 4.     The Gun Discovered in 2001

Plaintiff Flowers also vaguely alleges "Defendants failed to test a .380 handgun" recovered at a home near Tardy Furniture 5 years after the murders took place. *Id*. at ¶101.  Flowers claims "Upon information and belief, the gun was then given to Evans' office so that it could be sent to the state crime lab for testing in connection with the Tardy's Furniture murders. However, the crime lab has no record of receiving it." *Id*. at ¶ 103.

In response to these allegations, Investigator Johnson affirms no piece of evidence was ever in his control and he was not charged with testing any piece of evidence. (Exhibit "A"). Regarding the other claims, Johnson affirms:

Multiple witnesses supported the theory that Flowers went to retrieve Doyle's gun in the early morning hours, went home and then returned to downtown Winona and the Tardy store to commit the murders just before 10:00 a.m.  As for Mr. McChristian, a route witness, two other witnesses fully supported his testimony of seeing Flowers on the morning of the murders - Clarence Forrest and Benard Seals. Both witnesses saw Curtis before 8:00 a.m. coming from the direction of Doyle's car, where Flowers would have picked up the gun used in the murders. (Exhibit "A").

As for Odell Hallmon, Johnson did not and could not have promised Hallmon anything in exchange for any testimony. (Exhibit "A").  Johnson interviewed Hallmon, and took his information, but these interviews all happened well after Flowers had already been tried and convicted for the murders. (Exhibit "A").

Finally, Clemmie Fleming - who testified she saw Flowers running from Tardys' just after the murders - testified 6 times as to her absolute recollection that Flowers was seen running as if "someone were after him" just after the murders and immediately in the vicinity of Tardy's. (Exhibit

17

"A").

Johnson's theory of the case was that Flowers was mad and desperate following his being fired from Tardy's and something snapped in him that morning of July 16, 1996. (Exhibit "A"). Johnson believed Flowers had the means, motive and opportunity to commit these murders and it is still his firm belief that he is guilty, just as multiple other jurors have so found. (Exhibit "A").

As for any evidence involved in this case, all evidence in this case was handled by and in the possession, care, custody and control of Jack Matthews and Wayne Miller of the Mississippi Highway Patrol. (Exhibit "A").

Johnson now moves this Court for dismissal of the charges against him based on either absolute or qualified immunity.

## II. ARGUMENT AND AUTHORITY

Defendant John Johnson is either entitled to absolute immunity for all claims made herein or, at the very least, this Defendant is entitled to qualified immunity.

Johnson pleads for summary judgment as to all claims made against him.

The standard for summary judgment mirrors that for judgment as a matter of law, that is the moving party is entitled to summary judgment if there is no genuine issue of material fact making the movant entitled to judgment as a matter of law. *Morris v. Covan World Wide Moving, Inc*., 144 F.3d 377, 380 (5th Cir. 1998); Fed.R.Civ.P. 56. The nonmoving party cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

A document is incorporated by reference where the complaint "make[s] a clear, definite and

18

substantial reference" to it. *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275-76 (S.D.N.Y. 2002) (collecting cases). "[E]ven if not attached or incorporated by reference, a document 'upon which [the complaint] solely relies and which is integral to the complaint' may be considered by the court in ruling on [a motion to dismiss]." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (second alteration in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); and citing *Glob. Network Commc'ns*, 458 F.3d at 156). "A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Chambers*, 282 F.3d at 153).

In addition, the Court may take judicial notice of certain publicly available documents, including, for example, a plaintiff's arrest reports, indictments, and criminal disposition data. *Corley v. Vance*, 365 F. Supp. 3d 407, 432 (S.D.N.Y. 2019) (collecting cases); see *Blue Tree Hotels Inv.* (Can.), *Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (noting that courts may "look to public records, including complaints filed in state court, in deciding a motion to dismiss" (citing *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002); and *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998))). When taking judicial notice of such documents, the Court does so "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." [*16] *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1991)).

### Section 1983

To state a claim under Section 1983, a plaintiff must plausibly allege "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they

did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001)

(quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S. Ct. 977, 143 L. Ed.

2d 130 (1999)). "Section 1983 itself creates no substantive rights; it provides only a procedure for

redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.

1993).

**Absolute Immunity**

The Supreme Court has "stressed the importance of resolving immunity questions at the

earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed.

2d 589 (1991) (per curiam) (collecting cases); see *Deronette v. City of New York*, No. 05 CV

5275(SJ), 2007 U.S. Dist. LEXIS 21766, 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (citing

*Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985); and *United States*

*v. Colbert*, No. 87 Civ. 4789, 1991 U.S. Dist. LEXIS 12790, 1991 WL 183376, at *4 (S.D.N.Y. Sept.

11, 1991)). Indeed, it is appropriate to address the issue of absolute immunity before assessing

whether the plaintiff has sufficiently alleged constitutional violations. See *Pinaud v. County of*

*Suffolk*, 52 F.3d 1139, 1148 n.4 (2d Cir. 1995).

Immunity may be asserted as a defense in an 12(b)(6) motion where "the facts supporting the

defense appear[] on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004)

(citing Pani, 152 F.3d at 74-75); see also *Deronette*, 2007 U.S. Dist. LEXIS 21766, 2007 WL

951925, at *4 ("Courts may consider absolute immunity on a 12(b)(6) motion to dismiss when facts

establishing the defense appear directly in the complaint." (citing *Hill v. City of New York*, 45 F.3d

653, 663 (2d Cir. 1995))).

The doctrine of "absolute immunity protects a prosecutor from § 1983 liability for virtually

20

all acts, regardless of motivation, associated with his function as an advocate." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994); see also *Root v. Liston,* 444 F.3d 127, 131 (2d Cir. 2006) (describing absolute immunity as an "extreme protection"). The doctrine "creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney." *Pinaud*, 52 F.3d at 1147. A prosecutor asserting immunity bears the burden of showing that it applies. *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (citing *Burns v. Reed*, 500 U.S. 478, 486-87, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991)).

Prosecutorial immunity applies to the prosecutor's actions in initiating the prosecution and in carrying the case through the judicial process. See *Graves*, 1 F.3d at 318; see also *Brummett v. Camble*, 946 F.2d 1178, 1181 (5th Cir. 1991)(concluding that state prosecutors were absolutely immune from a §1983 action predicated on malicious prosecution), cert. [*4] denied, 504 U.S. 965, 112 S. Ct. 2323, 119 L. Ed. 2d 241 (1992); *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir. 1986) (en banc)("[A] conspiracy between judge and prosecutor to predetermine the outcome of a judicial proceeding, while clearly improper, nevertheless does not pierce the immunity extended to judges and prosecutors."). Plaintiff has alleged no facts that could overcome the absolute immunity of the judges or the district attorneys.

The same absolute immunity applies to investigators employed with the District Attorney's Office. *Brown v. Harrington*, 2012 U.S. Dist. LEXIS 115864 (S.D. Tex. 2012). Investigators of district attorneys are entitled to absolute prosecutorial immunity for acts done within their prosecutorial role. See *Garza v. Guerra*, 2009 U.S. Dist. LEXIS 3304, 2009 WL 136022, 7 (S.D.Tex. 2009) (citing *Ryland v. Shapiro*, 708 F.2d 967, 975 (5th Cir. 1983)).

Multiple circuits have held that investigators of district attorneys are entitled to absolute

21

prosecutorial immunity for acts done within their prosecutorial role: *Gobel v. Maricopa County*, 867 F.2d 1201, 1203 n.5 (9th Cir. 1989) (investigators, employed by a prosecutor and performing investigative work in connection with a criminal prosecution, are entitled to the same degree of immunity as prosecutors); *Norton v. Liddel*, 620 F.2d 1375, 1381-82 (10th Cir. 1980) (as to district attorney's investigators, it would hardly seem reasonable to exculpate the district attorney and to not immunize his underlings); *Waits v. McGowan*, 516 F.2d 203, 205 (3d Cir. 1975) (detective employed directly by and working under district attorney on specific matter related to prosecution is unlike ordinary police officer engaged in general law enforcement and exercising individual discretion; when function of prosecutor and detective are the same, the immunity they are accorded is the same).

In determining whether a prosecutor is entitled to absolute immunity, courts apply a "functional" test, "looking to the function being performed rather than to the office or identity of the defendant." *Hill*, 45 F.3d at 660 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993)). Under the functional test, prosecutors "are absolutely immune from claims arising from conduct 'intimately associated with the judicial phase of the criminal process.'" *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 357 (2d Cir. 2004) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)). The functional test is objective. *Hill*, 45 F.3d at 662. Courts must "view the relevant circumstances as would a reasonable official in the claimant's position," *Giraldo*, 694 F.3d at 165-66 (collecting cases), and consider "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor," *Id*. at 166.

Absolute prosecutorial immunity covers "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an

22

advocate for the State." *Buckley*, 509 U.S. at 273. This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, No. 11 Civ. 316(PGG), 2012 U.S. Dist. LEXIS 94078, 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, No. 00 CIV 3626(SHS), 2000 U.S. Dist. LEXIS 13292, 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)). Immunity even extends to "the falsification of evidence and the coercion of witnesses," *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citing *Lee v. Willins*, 617 F.2d 320, 321-22 (2d Cir. 1980)), "the knowing use of perjured testimony," "the deliberate withholding of exculpatory [*19] information," *Imbler*, 424 U.S. at 431 n.34, the "making [of] false or defamatory statements in judicial proceedings," *Burns,* 500 U.S. at 490 (collecting cases), and "conspiring to present false evidence at a criminal trial," *Dory*, 25 F.3d at 83.

Absolute immunity generally applies "where some type of formal proceeding had been commenced or was being commenced by the conduct at issue. *Tabor v. New York City*, No. 11 CV 0195 FB, 2012 U.S. Dist. LEXIS 29004, 2012 WL 603561, at *4 (E.D.N.Y. Feb. 23, 2012)); see *Warney v. Monroe County*, 587 F.3d 113, 123 (2d Cir. 2009) (noting that "a prosecutor's function depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate").

Conversely, absolute immunity generally does not apply "where formal proceedings have not begun and the prosecutor is acting in an investigative capacity."*Tabor*, 2012 U.S. Dist. LEXIS 29004, 2012 WL 603561, at *4). It is therefore critical to distinguish between "those preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and those investigative steps taken to gather evidence." *Smith*, 147 F.3d at 94.

"After probable cause has been established, it is more likely that the prosecutor acts as an advocate." *Cousin v. Small,* 325 F.3d 627, 633 (5th Cir. 2003).

### Qualified Immunity

Where absolute immunity does not apply, a prosecutor or his investigator is eligible only for qualified immunity. *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (citing *Buckley*, 509 U.S. at 273). The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident. *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S. Ct. 800, 133 L. Ed. 2d 747 (1996).

Qualified immunity cloaks a police officer from personal liability for discretionary acts which do not violate well established law. Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated. *Richardson v. Oldham*, 12 F.3d 1373, 1380-81 (5th Cir. 1994), and cases cited therein. Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002).

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties:

"The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the officials allegedly wrongful conduct violated clearly established law." *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001), [*13]

citing *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992).

The bifurcated test for qualified immunity is: (1) whether the plaintiff has alleged a violation of a clearly established constitutional rights; and. (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident. *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998), and cases cited therein.

The first step is to determine whether the plaintiff has alleged violation of a clearly established constitutional right. This analysis is made under the currently applicable constitutional standards. *Hare*, 135 F.3d at 325. A constitutional right is clearly established if, in light of pre-existing law, the unlawfulness is apparent. Officials must observe general, well-developed legal principles. *Doe v. Taylor Independent School Dist.*, 15 F.3d 443, 445 (5th Cir.), cert. den., 513 U.S. 815, 115 S. Ct. 70, 130 L. Ed. 2d 25 (1994).

The second prong of the qualified immunity test is better understood as two separate inquiries: (1) whether the allegedly violated constitutional rights were clearly established at the time of the incident and, if so, (2) whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law. *Hare*, 135 F.3d at 325-26. Objective reasonableness is a question of law for the court. The analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits). For qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident and, under that standard (the minimum standard not to be deliberately indifferent), the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable. *Hare*, 135 F.3d at 328.

The qualified immunity doctrine does not protect an official whose subjective intent was to

25

harm the plaintiff, regardless of the objective state of the law at the time of his conduct. *Douthit v. Jones*, 619 F.2d 527, 533 (5th Cir. 1980). A party seeking to avoid a qualified immunity defense must prove that the official either actually intended to do harm to him, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. *Douthit*, 619 F.2d at 533.

### Allegations Implicating Johnson

The allegations in the Complaint implicating John Johnson appear to focus on four issues: (1) Johnson and Evans' dealings with Odell Hallmon; (2) Johnson interviewing certain route witnesses; (3) the DA's office investigation of other suspects and (4) the investigators not testing an alternative murder weapon discovered 5 years after the murders.

### Summary of Argument

For all dealings with Hallmon, Mr. Johnson is entitled to immunity. Any and all interviews with Hallmon occurred in preparation for trial and are entitled to absolute immunity vis a vis Johnson's work with D.A. Evans. All interaction with Hallmon took place after Flowers had already been convicted - twice. All interaction with Hallmon was a part of the advocacy role of the D.A. in preparation for additional trials, entitling Johnson to absolute immunity.

Further, Johnson's dealings with route witnesses and his taking of statements were also in preparation for trial and, in any case, all of his actions were objectively reasonable. As such, Johnson is entitled to absolute immunity or, at the very least, qualified immunity for the way in which he interviewed route witnesses in this case.

Moreover, there is no constitutional right to any particular investigation of a case or the investigation of certain alternate suspects. Johnson is entitled to immunity as to any allegation he

26

should have more thoroughly investigated other suspects or evidence.

Finally, Johnson was not charged with the duty of being the custodian of evidence or facilitating the testing of evidence. Custody and testing of any and all evidence was in the hands of the Mississippi Highway Patrol. As such, Johnson cannot have committed a constitutional violation for not testing a weapon he was not charged with testing, years and years after multiple Flowers' convictions.

For all of these reasons, the Complaint against Johnson must be dismissed.

## I.      Johnson is Entitled to Absolute Immunity for any Dealings with Odell Hallmon.

With regard to any claim related to Odell Hallmon, Investigator Johnson is entitled to absolute immunity. This is because all interaction with Hallmon occurred after indictment, arrest and multiple convictions of Flowers and was instigated by D.A. Evans. As such, Johnson would be entitled to the same prosecutorial immunity as the D.A..

As alleged, all interactions with jailhouse snitch Hallmon occurred well after Flowers had already been tried and convicted for the Tardy murders. The interaction with Hallmon was a part of the D.A.'s trial preparation and not a part of Johnson's initial investigation.

As such, to the extent any claim is plausibly stated against Johnson, related to Odell Hallmon, same must be dismissed as this D.A. Investigator is entitled to the same immunity as his District Attorney. The extension of that immunity reaches the entirety of the allegations as to Evans and Johnson's alleged dealings with Hallmon.

Absolute prosecutorial immunity extends to persons assisting and working under the direction of prosecutors, when they perform functions closely tied to the judicial process. *Davis v. Grusemeyer*, 996 F.2d 617, 630 n.28 (3d Cir. 1993), overruled on other grounds *by Rolo v. City*

27

*Investing Co. Liquidating Tr.*, 155 F.3d 644 (3d Cir. 1998)); Absolute prosecutorial immunity that protects ADA extends to the Investigator Defendants. See *Hamilton v. City of New York,* No. 15-CV-4574 (CBA) (SJB), 2019 U.S. Dist. LEXIS 56606, 2019 WL 1452013, at *13 (E.D.N.Y. Mar. 19, 2019) (extending absolute immunity to an investigator of the district attorney's office who sought to procure false testimony from a witness); *Jackson v. Seewald, No. 11* Civ. 5826(LAK)(JCF), 2013 U.S. Dist. LEXIS 7733, 2013 WL 149341, at *7 (S.D.N.Y. Jan. 14, 2013) (extending absolute immunity to investigators of the district attorney's office); see also *O'Neal v. Morales*, 679 F. App'x 16, 18-19 (2d Cir. 2017) (summary order) (affirming grant of absolute immunity to detective who conducted investigative acts that furthered the advocacy function of preparing for trial "at the behest of the [ADA]" and "only because the ADA requested that he do so").

Here, all interaction with Hallmon, as alleged, took place in preparation for trial and at the behest of the D.A.. As such, Johnson is cloaked with the D.A.'s prosecutorial immunity.

As for any promises made to Hallmon in exchange for his testimony, Flowers does not allege Johnson promised him anything in return for his testimony. In order to establish the personal liability of a certain defendant to plaintiffs who are claiming damages for deprivation of his civil rights, plaintiffs must show that particular defendant's action or inaction was a violation of the plaintiffs' civil rights. *Reimer v. Smith*, 663 F.2d 1316, 1322 n. 4 (5th Cir. 1981). Also, *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1098 n. 7, 89 L.Ed.2d 271 (1986). Plaintiff has not alleged or offered any proof of any act or omission by Johnson which constitutes a violation of his civil rights.

Indeed, Johnson has no authority to offer any "deal" in return for any testimony. (Exhibit "A"). However, if such a claim is being made, Johnson is also cloaked in absolute immunity as to this claim as well.

28

Absolute immunity applies to Johnson as Evans' investigator. Judicial proceedings had already commenced by the time anyone from Evans' office spoke to Hallmon. In fact, as to any claim against Johnson in his dealings with Odell Hallmon, Flowers had already been twice prosecuted and convicted. Absolute immunity generally applies "where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." *Tabor v. New York City*, No. 11 CV 0195 FB, 2012 U.S. Dist. LEXIS 29004, 2012 WL 603561, at *4 (E.D.N.Y. Feb. 23, 2012)); see *Warney v. Monroe County*, 587 F.3d 113, 123 (2d Cir. 2009) (noting that "a prosecutor's function depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate").

Flowers' Complaint alleges that Evans and Johnson both knew Hallmon was lying, but allowed him to testify anyway. While Johnson denies these allegations entirely, absolute prosecutorial immunity still affords him protection as all interaction with Hallmon was a part of Evans' bringing his case to trial.

The entire premise behind Hallmon's testimony was to bolster Evans's case against Flowers. This was all done in the prosecutorial role of Evans and is therefore cloaked with immunity. Likewise, Johnson would enjoy the very same immunity to the extent he spoke to Hallmon at all. Absolute prosecutorial immunity extends to "the falsification of evidence and the coercion of witnesses," *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citing *Lee v. Willins*, 617 F.2d 320, 321-22 (2d Cir. 1980)), "the knowing use of perjured testimony," "the deliberate withholding of exculpatory information," *Imbler*, 424 U.S. at 431 n.34, the "making [of] false or defamatory statements in judicial proceedings," *Burns,* 500 U.S. at 490 (collecting cases), and "conspiring to present false evidence at a criminal trial," *Dory*, 25 F.3d at 83.

29

Again, while Johnson denies he did anything more than interview Hallmon and record his statements, such activities were done to better the case against Flowers at trial as directed by Evans. As such, absolute immunity would apply.

As such, for all of the allegations related to Hallmon, absolute immunity applies and summary judgment is warranted for Mr. Johnson. Alternatively, Johnson is entitled to qualified immunity for his limited interaction with Hallmon which consisted of taking his statements in preparation for trial.

**II.    Johnson is Entitled to Absolute Immunity with Regard to the Route Witnesses**.

Flowers also critiques Johnson's investigation related to certain "route" witnesses, claiming a constitutional violation because two witnesses have now waffled as to whether they saw Flowers on the murder route on the day of the murders or, perhaps, another day.

However, these same two witnesses - like so many others - in multiple statements and at trial affirmed they saw Flowers headed from the direction of the location of the murder weapon on the morning of the murders and then away from the Tardy store immediately following the murders.

Boiled down to its essence, Flowers appears to argue that two witnesses - Clemmie Flemming and Ed McChristian - now both are unsure of the day they saw Flowers. But, these same witnesses testified in multiple trials that they absolutely saw Flowers fleeing the Tardy's Furniture store on the day of the murders (Flemming) and away from the area where the murder weapon was stolen (McChristian).

Clemmie Flemming testified she saw Flowers fleeing the murder scene in the moments after the killings. She said he was running. Clemmie Fleming's statement was given well after Flowers was arrested and she repeated her testimony time and again. As such, any interaction with Johnson

30

would be cloaked in absolute prosecutorial immunity as probable cause had been established and the case was being prepared for trial.

Moreover, Clemmie testified she saw Flowers fleeing the murder scene in 6 trials, each time stating unequivocally that she saw Flowers running from Tardy Furniture in the moments after the murders. Flemming now is unsure if she saw Flowers the day of the murders. However, Johnson committed no constitutional violation by bringing a witness to trial who consistently stated she saw Flowers running from the murder scene on the day of the murders. Johnson would at least be afforded qualified immunity for his dealings with this witness as his conduct was not objectively unreasonable in light of clearly established law.

The same holds true for the McChristian statement, as there is no allegation that Johnson forced or coerced this witness to testify a certain way. McChristian states "Somebody had told [the investigators] I seen him, so I couldn't say I didn't see him." (Complaint [Doc. 1] at p. 18, ¶73). McChristian explained "So all I had to do was go there, and they asked me a question and I answered it." *Id*.

There can be no constitutional violation when this Defendant did not tell McChristian or any other witness to testify any certain way. (Exhibit "A"). Johnson simply collected the evidence as it was presented to him. Morever, if Johnson is not afforded absolute immunity for the statements taken from McChristian, then he is at the very least entitled to qualified immunity. Multiple additional witnesses supported Mr. McChristian's statement including the two men sitting on McChristian's porch the morning of the murders - Benard Seals and Clarence Benard Forrest. Both Seals and Forest offered testimony mirroring McChristian's testimony entirely. (See Statements Exhibit "B" McChristian's statement, Exhibit "C" Seals' statement, and Exhibit "D" Forrest's

31

statement).

It was not objectively unreasonable for Johnson to accept McChristian's testimony when others fully supported McChristian's version of events. The same is true for Clemmie Flemming. It is not objectively unreasonable to accept a witnesses' testimony who presents that testimony in a consistent manner over the course of several years and at 6 different trials.

For all of these reasons, the Complaint against Johnson must be dismissed.

## III. Johnson is Entitled to Immunity for Claims He Should Have Investigated Other Suspects More Thoroughly or Examined the "New" Weapon.

The failure to investigate claim against Johnson fails entirely as does the claim that there should have been further investigation of a "new" weapon discovered well after Flowers was convicted on multiple occasions.

There is no constitutional right to an investigation. *Mitchell v. McNeil*, 487 F.3d 374 (Gth Cir. 2007). Therefore, there is no constitutional basis for a Section 1983 action based on an "unreasonable investigation." *Shields v. Twiss*, 389 F.3d 142 (5th Cir. 2004). The due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. *Kingsland v. Miami*, 382 F.3d 1220, 1228-1231 (11 th Cir. 2004); *Biasella v. City of Naples*, 2005 U.S. Dist. LEXIS 20211, 2005 WL 1925705, *4 (M.D.Fla. 2005).

Flowers appears to argue that Johnson committed a constitutional violation by not investigating other suspects. But there is no such constitutional right. As such, this allegation must be dismissed.

Moreover, Johnson completed a thorough investigation, interviewing multiple witnesses and gathering evidence. Johnson would then be entitled to qualified immunity in any case as his actions

were objectively reasonable in light of clearly established law. Johnson's affidavit Exhibit "A" sets forth the multiple witnesses and tangible evidence pointing to Flowers' guilt for these murders. Flowers now questions his convictions, but this does not negate the fact that the investigators collected numerous witnesses and evidence establishing probable cause.

The same is true for the investigation of a newly discovered weapon.

There is no constitutional guarantee for any piece of evidence to be investigated. However, even if there was a constitutional right implicated by the discovery of the weapon, the choice to test it was not Johnson's to make. Mr. Johnson was not charged with the duty of testing any piece of evidence involved in this investigation. As such, this argument fails entirely and dismissal is warranted.

**State Law Claims Joinder**

Defendant John Johnson also adopts and incorporates by reference all arguments made by Defendant District Attorney Doug Evans regarding the state law claims made. Johnson adopts these arguments in their entirety and moves the Court for dismissal of the state law claims as articulated by Mr. Evans in his Motion and Memorandum in support of dismissal of the Complaint. [Doc. 7].

**III. CONCLUSION**

**NOW, THEREFORE,** John Johnson respectfully moves this Court to dismiss the claims in the Complaint against him with prejudice pursuant to Rule 12(b)(6) & (c), *Fed. R. Civ. Proc.*

**RESPECTFULLY SUBMITTED** this the 2nd day of August, 2022.

**JACKS| GRIFFITH| LUCIANO, P.A.**

By:    /s/ ***Jamie F. Lee***
        Daniel J. Griffith, MS Bar No. 8366
        Jamie F. Lee, MS Bar No. 101881
        Attorneys for Defendant John Johnson

Of Counsel:

**JACKS| GRIFFITH| LUCIANO, P.A.**
150 North Sharpe Street
P. O. Box 1209
Cleveland, MS 38732
Phone No. (662) 843-6171
FAX No. (662) 843-6176
Email: dgriffith@jlpalaw.com
           jamie@jlpalaw.com

## CERTIFICATE OF SERVICE

I, Jamie F. Lee, attorney of record for John Johnson, do hereby certify that I have this day caused a true and correct copy of the above and foregoing *Memorandum of Authorities in Support of Motion for Absolute or Qualified Immunity* to be delivered by the ECF Filing System which gave notice to the following:

> Mary Jo Woods
> Gerald L. Kucia
> MS Attorney General's Offie
> Email: mary.woods@ago.ms.gov
>            gerald.kucia@ago.ms.gov
> **Attorneys for Doug Evans**
>
> Hal S. Spragins, Esq.
> Lawrence John Tucker, Jr.
> Hickman, Goza & Spragins, PLLC
> Email: sspragins@hickmanlaw.com
>            lawrencetucker@hitkmanlaw.com
> **Attorneys for Wayne Miller**
>
> Berkley N. Huskison, I, Esq.
> Mitchell McNutt & Sams
> Email: bhuskison@mitchellmcnutt.com
> **Attorney for Jack Matthews**
>
> Jonathan L. Abram, Esq.
> Kaitlyn A. Golden, Esq.
> Kathryn Marshall Ali, Esq.
> W. David Maxwell, Esq.
> Email: jonathan.abram@hoganlovells.com
>            kaitlyn.golden@hoganlovells.com
>            kathryn.ali@hoganlovells.com

34

david.maxwell@hoganlovells.com
**Attorneys for Plaintiff**

Robert B. McDuff, Esq.
Robert B. McDuff, Attorney
Email: rbm@mcdufflaw.com
**Attorney for Plaintiff**

**DATED** this 2nd day of August, 2022.

/s/  ***Jamie F. Lee***
Jamie F. Lee